In re **MIDLAND UNITED CO.**

No. 1073.

District Court, D. Delaware.

Feb. 13, 1946.

Hugh M. Morris, of Wilmington, Del., trustee of Estate of Midland United Co.

Max Swiren and Ben W. Heineman, both of Chicago, Ill., for Hugh M. Morris, trustee of Estate of Midland United Co.

Clarence A. Southerland, of Wilmington, Del., and J. Samuel Hartt, of Chicago, Ill., successor trustees of Estate of Midland Utilities Co.

Lloyd F. Thanhouser, of New York City, Kurt F. Pantzer, of Indianapolis, Ind., and George I. Haight, Benjamin F. Goldstein, and Haight, Goldstein & Hobbs, all of Chicago, Ill., for Trustees of Midland Utilities Co.

James R. Morford, of Wilmington, Del., Clarence U. Carruth, Jr., and Curtis, Mallet-Prevost, Colt & Mosle, all of New York City, for Prior Lien Stockholders Committee of Midland Utilities Co.

Robert N. Golding, of Chicago, Ill., for Middle West Corporation.

William Prickett, of Wilmington, Del., and Leonard Ettelson and Samuel A. & Leonard B. Ettelson, all of Chicago, Ill., Carl W. Painter, of New York City, and Cravath, Swaine & Moore, of New York City, for Debenture Holders' Committee of Midland Utilities Co.

Charles F. Richards, of Wilmington, Del., and Robert Le Roy, Harold W. Conroy, and Cadwalader, Wickersham & Taft, all of New York City, for Committee for the

Protection of Holders of Series A, $3 Cumulative Convertible Preferred Stock, and Series 1, $6 Preferred Stock of Midland United Co.

Harold Evans, of Philadelphia, Pa., for Philadelphia Committee of Debenture Holders.

Morton Yohalem and Solomon Freedman, both of Philadelphia, Pa., for Securities and Exchange Commission.

Donald M. Graham, of Chicago, Ill., for Millard B. Kennedy.

Millard B. Kennedy, of Chicago, Ill., pro. se.

Caleb S. Layton, of Wilmington, Del., for Philadelphia Committee.

BIGGS, Circuit Judge.

The court is required to determine reasonable but adequate compensation for trustees, committee members and certain other individuals in the proceedings for reorganization of Midland United Company (United) and Midland Utilities Company (Utilities), Delaware corporations and registered holding companies. The court obtained jurisdiction of both corporations originally under the provisions of Section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207, in 1934. The provisions of Chapter X, 11 U.S.C.A. § 501 et seq., have been made applicable to the proceedings insofar as is practicable. The cases have been pending for nearly twelve years. Many of the applicants for compensation have taken part in the proceedings from their inception. A plan of reorganization approved by the Securities and Exchange Commission and by this court has now been consummated in large part. See In re Midland United Co., D.C., 58 F. Supp. 667. The plan referred to represents the fifth attempt made by one or more of the trustees or parties in interest to compromise some or all of the claims or to reorganize one or both of the debtors.

The record in the causes is one of the largest which the present writer has encountered and presented the complex questions of fact and law ordinarily present in holding company reorganizations. There were many litigations involving intercompany obligations between the debtors and other companies formerly owned, operated, or controlled by Samuel Insull and those associated with him. Other litigations involved financial institutions which had advanced large sums of money to the debtors or to their subsidiaries or affiliates. The proceedings have been before no less than three judges in the District of Delaware. The present writer's experience in the cases has been of approximately four years' duration and he has no personal knowledge of the proceedings prior to January 6, 1942. He has endeavored, however, to familiarize himself with the record and believes that from such examination and from a careful study of the applications for compensation he can do justice to the applicants. He has had also the advantage of the recommendations of the Securities and Exchange Commission as to the work performed by the applicants and the value of that work. It is appropriate to state that without the expert administrative assistance of the Commission and of members of its staff it would have been difficult, if not impossible, to arrive at and to consummate a fair and equitable plan of reorganization within the intent of the Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79 et seq.

In reorganization proceedings as complex as those which were before the court it is obvious that even the most experienced lawyers must not infrequently spend time and energy in work which does not bear fruit. By the very nature of things there must be a certain amount of waste motion however well and earnestly trustees, committees and counsel embark upon their respective duties. There is also, almost of necessity, some duplication of effort and to some degree at least a useless expenditure of time. My experience with the proceedings at bar assures me, however, that these inevitabilities have been singularly limited in the instant proceedings; that there has been small duplication of effort, little lost motion, and that trustees, committees and counsel in large part have performed their duties skillfully and well. The provisions of Chapter X of the Bankruptcy Act have been applied to the present applications since it is "practicable" to do so. I will deal with the applications in the approximate order in which they were noticed and heard.

Hugh M. Morris was originally not only the trustee of the estate of United but also of the estate of Utilities. He was appointed to the two offices on July 7, 1934, by Judge John P. Nields. John N. Shannahan of Indianapolis was appointed co-trustee with Judge Morris. Mr. Shannahan died on August 16, 1938, and Judge

Morris served as the sole trustee of Utilities from that date until October 24, 1938, when, because of an apparent conflict between the estates of Utilities and United, he resigned as trustee of Utilities. Clarence A. Southerland and Jay Samuel Hartt were appointed successor trustees of Utilities on October 24, 1938. Judge Morris served as sole trustee of United until September 22, 1939, when Ray Garrett of Chicago was appointed as a temporary cotrustee. Mr. Garrett's services as cotrustee terminated as of January 1, 1940, and Judge Morris served as sole trustee of United from that day on. It is a fact therefore that his services as trustee of Utilities endured for a period of more than 4¼ years and that he has been sole trustee or cotrustee of United for more than 11 years. It is unnecessary to recount in this opinion the multiplicity of services which Judge Morris has rendered to the estates and has rendered faithfully and well.[1]

Judge Morris has received on account of his services on behalf of United the sum of $70,000 and on account of his services to Utilities the sum of $10,000. He requests additional compensation from United in the sum of $129,333 and additional compensation from Utilities in the sum of $32,917. The Securities and Exchange Commission has recommended an additional over-all allowance to Judge Morris in the sum of $130,000 or $32,250 less than he has requested.

■ The Commission contends that the amount of $30,000 per year as suggested by the applicant is appropriate until the year 1938, but that from 1938 to 1942 there would be no injustice in compensating him upon an annual basis of $15,000 a year; that for the period after 1942 the sum of $7,500 per annum would be adequate in view of the more limited nature of services then rendered. On such a basis Judge Morris' total compensation would aggregate $210,000. Too fine a line, however, cannot be drawn. In my opinion $215,000 as his total compensation will be just and

adequate for Judge Morris. An additional payment of $135,000 will be made to him.

Max Swiren was attorney for the trustee of United. Mr. Swiren's entry into the case was attended by unusual circumstances which may be recounted briefly. On April 2, 1935, Judge Nields appointed Daniel O. Hastings, Esquire, as a special master to hear and determine claims of creditors and stockholders of United and Utilities. The claims against the respective estates were sent to Mr. Hastings and on or about December 2, 1938, the successor trustees of Utilities filed claims against United. Many other claims were filed with the Special Master and numerous objections were asserted thereto. The most important of these litigations embraced questions the solution of which assertedly involved application of the principles enunciated in Taylor v. Standard Gas & Electric Co., 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669.

■ After the passage of two years comparatively little progress had been made toward the disposition of these proceedings. In May, 1940, Judge Nields, feeling that action was necessary in order that the cases might progress, called Mr. Swiren on the telephone at his office in Chicago and asked him to come to Wilmington for a conference, indicating that it was his intention to appoint him as counsel for the United trustee. At a conference held in chambers on May 31, 1940, Judge Nields stated that it was imperative that Mr. Swiren devote himself to the litigations then pending before the Special Master to the exclusion of all other matters of his practice. Millard B. Kennedy was then serving as counsel for Judge Morris and Mr. Swiren's services were to be in addition to those of Mr. Kennedy. On June 28, 1940, the court formally constituted Mr. Swiren attorney for the United trustee. Between June 5, 1940, and May 25, 1945, it appears that Mr. Swiren and his partners and associates devoted 307 days and 11,257 hours, to work for the United trustee. Of this total 226 days and 2,912

---

[1] No rule of thumb may be applied for the valuation of services in the case at bar or indeed in any like case. Most of the factors upon which I base my judgment of the proper allowances to be made are set out in Root Refining Co. v. Universal Oil Products Co., 3 Cir., 147 F.2d 259, and upon the authorities cited in the annotation to In re Dehner's Estate, an opinion of the Supreme Court of Iowa, 230 Iowa 490, 298 N.W. 656, 143 A.L.R. 672, et seq.; In re Watco Corporation, 7 Cir., 95 F.2d 249, 251, and In re National Department Stores, D.C.Del., 11 F. Supp. 633.

hours were devoted by Mr. Swiren himself to his task. Mr. Swiren has received $70,000 on account. He has asked for additional compensation in the sum of $220,000, or a total of $290,000. The Commission has recommended that his additional compensation be limited to $180,000. Again no rule of thumb can be applied but the suggestion seems just. I shall accept the recommendation and allow additional compensation to Mr. Swiren in the amount of $180,000.

■ Kurt F. Pantzer has filed a petition requesting that he receive presently from the estate of United $15,000 and from the estate of Utilities $7,500. He petitions as a surviving partner of the firm of Smith, Remster, Hornbrook and Smith on behalf of the remaining surviving partners for a final allowance of compensation to Henry H. Hornbrook, deceased, who was counsel for the trustees of United from July 10, 1934, until September 20, 1935, Mr. Hornbrook having died upon the date last stated. Mr. Hornbrook had received as an ad interim allowance for the value of his services to United the sum of $10,000. Mr. Hornbrook also served as counsel for the trustees of Utilities during the dates hereinbefore stated and received as an allowance on account for these services the sum of $5,000. The services rendered by Mr. Hornbrook need not be specified in this opinion. It is sufficient to state that they were of the nature usually rendered by counsel for trustees in reorganization proceedings. The court entertains no doubt that they were rendered competently. The Commission has recommended as additional compensation for Mr. Hornbrook from both estates a total of $22,500, the sum requested by Mr. Pantzer. I will accept this recommendation.

■ George N. Lindsay, Albert D. Farwell and Edward S. Blagden, as a Committee for the Protection of the Holders of Series A, $3 Cumulative Convertible Preferred Stock and Series 1, $6 Preferred Stock of United, called the "Lindsay Committee", have petitioned for compensation in the sum of $15,000. The Commission has recommended for Mr. Farwell and for Mr. Blagden respectively compensation in the amount of $2,000, but recommends that Mr. Lindsay be allowed nothing by reason of an asserted disqualification. I shall discuss certain aspects of the applications of Mr. Lindsay and Mr. Blagden at a later point in this opinion. The Lindsay Committee was formed for the protection of the holders of both classes of stock by "The Association of Investment Trusts of London, England". The committee has represented more than 35,000 shares of the $3 stock and has been actively in touch with most of the proceedings for a period of about eight years. I do not doubt that the committee's services have proved helpful but I do not deem them to be worth $15,000. On the other hand, I think the recommendation of the Commission is on the low side. I therefore will allow to Mr. Farwell the sum of $2,500. A like allowance will be made to Mr. Blagden, for I do not consider him disqualified to receive compensation as will hereinafter appear.

■ The Lindsay Committee was represented by Cadwalader, Wickersham & Taft, and in particular by Mr. Robert LeRoy. It appears that the partners of that firm devoted approximately 675 hours to the work of representing the committee, the senior assistants of the firm approximately 750 hours thereto and junior assistants approximately 63 hours or a total of approximately 1490 hours. The firm requests compensation in the sum of $30,000. The Commission has recommended compensation in the sum of $10,000. The recommendation of the Commission seems to me to be upon the low side. I shall allow the firm compensation in the sum of $12,000.

■ Empire Trust Company served as the depository for the Lindsay Committee. It requests compensation in the sum of $4,880.10 for its services and the amount of $345.66 for its agent, City National Bank & Trust Company, or total compensation of $5,225.76. It appears that the applicant holds $1,383.56 in withdrawal fees. The Commission suggests and I agree that the sum of $5,225.76, which shall be deemed to include the withdrawal fees, is fair and adequate compensation. Accordingly such compensation will be allowed to this applicant.

■ Charles F. Richards of Richards, Layton & Finger, represented the Lindsay Committee as local associate counsel and has requested compensation for his firm in the sum of $2,000. The Lindsay Committee represented the $3 Preferred Stock and the $6 Preferred Stock of United. Caleb S. Layton of the same firm as local associate counsel represented the so-called "Philadelphia" Committee of which

406

James J. Magill was chairman. He has requested compensation for his firm in the amount of $500. The Philadelphia Committee represented Utilities debentures. The interests of the owners of the securities represented respectively by the Lindsay Committee and by the Philadelphia Committee were in conflict with each other and the same law firm should not have represented both committees because of duality of position. See Woods v. City National Bank & Trust Co. of Chicago, 312 U.S. 262, 61 S.Ct. 493, 85 L.Ed. 820, and Weil v. Neary, 278 U.S. 160, 49 S.Ct. 144, 73 L.Ed. 243, cited therein. Both Mr. Richards and Mr. Layton were unaware, however, of their respective representations until the hearing upon the fee applications.

Mr. Richards states that neither Mr. Layton nor he ever met any members of the committees and never conferred with any of them "either personally, in writing, or otherwise"; that each solicitor was retained only to carry out such instructions as they received from their respective associates; and that therefore there was no possibility of an actual conflict of interests. I accept this statement as correct and as the precise truth. I cannot agree, however, with the contention that there was no possibility of conflict of interest or that in fact there was none. The representations were in conflict, and though this was inadvertent and therefore without the slightest moral blame or stigma, I am constrained to the view that neither Mr. Richards nor Mr. Layton may be allowed compensation. Such a ruling indeed is imposed upon me by the principle enunciated in the Woods case. See the language of Mr. Justice Douglas, 312 U.S. 262 at page 268, 61 S.Ct. 493, 497, 85 L.Ed. 820: "Where a claimant, who represented members of the investing public, was serving more than one master or was subject to conflicting interests, he should be denied compensation. It is no answer to say that fraud or unfairness were not shown to have resulted."

■■ Clarence A. Southerland was appointed a special trustee of Utilities by an order of Judge Nields entered October 8, 1937. He was to perform certain duties which need not be detailed here. On October 24, 1938, Mr. Southerland and Mr. Jay Samuel Hartt were appointed successor trustees of Utilities and have continued to serve as such. Mr. Southerland assumed the primary responsibility for the trustees' duties affecting the conduct of the numerous litigations in which the Utilities estate was involved. Mr. Hartt assumed the responsibility of administrative financing and the valuation of the utility system. They were an efficient team. I shall not set out here the services performed by each. It is sufficient to state that the problems presented to these trustees included most of the phases of utility operation and valuation. I have already commented upon the numerous litigations. Mr. Southerland has requested a total compensation of $100,000 and has received on account $40,403.23. The Commission has recommended that he be paid the precise amount requested by him, and since the court is of the opinion that the total compensation requested is modest in view of the services rendered, the allowance will be made. Mr. Hartt has requested a total compensation of $220,000 and has received ad interim allowances amounting to $118,459.67. The Commission has recommended that Mr. Hartt be paid additional compensation of $56,540.33, or a total of $175,000. I conclude that Mr. Hartt's request is too high and that the recommendation of the Commission is substantially correct. His compensation therefore will total $175,000.

■■ Millard B. Kennedy was the original and sole counsel for Judge Morris and Mr. Shannahan as trustees of United and of Utilities until the death of Mr. Shannahan, and thereafter and until October 26, 1938, Mr. Kennedy served as counsel for Judge Morris, the surviving trustee of each estate. From October 26, 1938 to June 5, 1940, he acted as sole general counsel for Judge Morris as trustee of United. From June 5, 1940 until June 30, 1941, he acted as co-counsel with Mr. Swiren for Judge Morris as trustee of the United estate. On June 30, 1941, Mr. Kennedy resigned because he had become associated with the firm of Mayer, Meyer, Austrian & Platt as a general partner. That firm represented a substantial creditor of both estates and hence a conflict of interest resulted.

During the period of his employment Mr. Kennedy handled some thirty or more matters of prime importance to the trustees or trustee of United and Utilities. His services were efficient and without going into detail it may be stated that his employment and that of his associate, Theodore L. Thau, covered a period of about

5 years and 8 months. He has requested total compensation for his services rendered United in the sum of $144,240 and for his services to Utilities a total compensation of $36,225. He has received on account of his services to United $93,500 and on account of his services to Utilities the sum of $28,535.25. He desires total compensation from both estates in the amount of $180,465, or additional compensation of $58,432.75. The Commission has recommended additional compensation for Mr. Kennedy in the amount of $20,000. I can apply no rule of thumb to Mr. Kennedy's services and their precise value of course is difficult to ascertain, since I was not presiding in the proceedings at the time they were performed. Upon considering the items of his petition, the number of hours expended by him and his associate and the nature of his services I am forced to conclude as did the Commission that his work was more or less "routine"; that is to say, was of the kind usually performed by a skilled attorney in administering a public utility system in reorganization proceedings. Mr. Kennedy retired from the case before the reorganization was worked out and before the numerous litigations were well under way. I think that the sum of additional compensation recommended by the Commission is substantially correct, and therefore I will allow him additional compensation in the amount of $20,000.

George I. Haight was employed by Messrs. Southerland and Hartt, trustees of Utilities, as attorney and counsel on December 13, 1938. Benjamin F. Goldstein, one of the senior partners of Mr. Haight's firm, as well as several associates and junior members, devoted a great deal of time to the affairs of Utilities. The total number of hours devoted by all concerned from 1938 to June 2, 1945, amounted to approximately 14,708. Mr. Haight and Mr. Goldstein, in particular, took part in the hearings before the Special Master on the claims and counterclaims made by and against Utilities and its subsidiaries.

Mr. Haight and Mr. Goldstein also represented the Utilities trustees at other hearings before the Special Master on other claims and counterclaims including those of Continental Illinois National Bank & Trust Company, the Peoples Gas, Light & Coke Company Service Annuity Trust.

Following these hearings Mr. Haight and Mr. Goldstein and the members of their firm and their associates exhaustively briefed the questions presented and filed very extensive requests for findings of fact and conclusions of law with the Master. Many hours were devoted to this work and to the subsequent argument before the Master.

The present writer directed the Master to report to the court as soon as possible his findings and conclusions in respect to the intercompany claims. Numerous objections to the Master's report, to his findings of fact and conclusions of law, were filed by Mr. Haight and Mr. Goldstein on behalf of the Utilities trustees. Mr. Goldstein made the chief argument to the court on behalf of the Utilities trustees in support of these objections. The questions presented were not decided by the court, which directed the trustees of the respective estates to endeavor to effect a compromise of their numerous claims and indeed of all the vexatious questions presented. At this point the important services rendered by Mr. Haight and Mr. Goldstein came to an end, the trustees of Utilities being represented in the negotiations by Mr. Lloyd Thanhouser as will appear hereinafter.

Mr. Haight has received ad interim allowances totalling $63,000, and requests the payment to him of additional compensation in the sum of $87,000, or a total compensation of $150,000. The Commission has recommended additional compensation for him in the sum of $40,000. The Commission's counsel has leveled certain criticisms at what he deemed to be Mr. Haight's and Mr. Goldstein's attitude in respect to possible settlement of the litigations. The Commission's counsel stated: "There was never, so far as I know, any effective gesture, or effective action on their [Haight's and Goldstein's] part to do anything more than litigate and litigate for the whole position, to litigate in terms of 'This is an open and shut case on the Utilities side.'" The comment is a fair one, but the fact is that throughout most of the period of Mr. Haight's employment, prior to the employment of Mr. Thanhouser, the intercompany claims were in litigation before the Master or the court. Counsel do not often take the position that the claims they represent are weak, even if that be the case.

I shall not penalize Mr. Haight or Mr. Goldstein for their attitude in this regard. On the other hand, I shall not award Mr.

Haight any very substantial compensation for services rendered after the hearings on the intercompany claims before the court. Mr. Thanhouser will be compensated for services rendered to the Utilities trustees in large part after this time. I conclude that the amount of $40,000 by way of additional compensation to Mr. Haight will compensate him adequately for the services rendered by him, by Mr. Goldstein and by the members of their firm and associates to the Utilities trustees.

Lloyd F. Thanhouser was employed pursuant to an order entered on March 27, 1943, to represent the Utilities trustees "* * * in connection with all matters pertaining to the hearings relating to or in connection with the * * * amended Plan of Reorganization * * *." It is unnecessary for the purposes of this opinion to state the long course of attempted negotiations which preceded and followed the creation of the amended plan of reorganization. This plan, subject to some subsequent modifications, formed the basis for the final compromise of the numerous complicated issues involved. On September 30, 1944, the Utilities trustees were authorized to extend Mr. Thanhouser's employment to include any transactions which might involve the City of Fort Wayne or others respecting transfers of the assets of Indiana Service Corporation. Mr. Thanhouser requests total compensation in the sum of $75,000, of which he has received $2,500 on account of Indiana Service. Of the sum of $75,000, $60,000 is allocated by him to the services rendered in connection with the reorganization and the remaining $15,000 is allocated by him to the services rendered to Indiana Service. The Commission takes the view that jurisdiction should be reserved by this court as to his request for services rendered in the Indiana Service situation since his employment in this regard has not yet terminated. I am disinclined to accept this view. I can perceive no reason why this court should not now make him an allowance for his services in the Indiana Service situation as well as for his services in connection with the reorganization. The future services of Mr. Thanhouser relating to Indiana Service Corporation may be compensated for as is proper under the circumstances. His future compensation is not a matter with which this court should concern itself.

I shall deal now with Mr. Thanhouser's services in the reorganization. Under the title, "The Results Achieved", paragraph 30 of his petition, Mr. Thanhouser states: "The Midland reorganization proceedings had been stalemated for nine years prior to Petitioner's appointment as Special Counsel for the Utilities trustees. Six months later agreements were reached which started the debtor corporations on their way out of the bankruptcy court, and a year and eight months after that they emerged. It will be generally conceded, Petitioner believes, that his efforts were primarily responsible for this successful conclusion of the proceedings." He gives evidence in support of this contention. The Commission and its counsel take a contrary view, contending that while Mr. Thanhouser make a substantial contribution to the reorganization, none the less he was not the architect of victory.

The Commission points out that Mr. Thanhouser entered the proceedings which had continued for nine years of somewhat acrimonious debate with a fresh point of view and with no battle history to mitigate the effect of his persuasiveness; he aided the result, says the Commission's counsel, but did not create it. Further summation of views on this point would be futile. As I have stated, Mr. Thanhouser entered the case at the end of March, 1943. His services in connection with the reorganization covered a period of about two years. The Commission has recommended that compensation be allowed him in the amount of $45,000 for his services in connection with the reorganization. I do not know that Mr. Thanhouser created the compromises which effected the reorganization, but it is my view that he contributed very substantially to that result. I conclude therefore that an allowance of $45,000 should be made to him for the services rendered by him to the amended plan and the reorganization. As to Mr. Thanhouser's compensation in connection with Indiana Service matters, in view of the services rendered by him as set forth in his petition, I will allow him $7,500 (of which he has received $2500), or a total compensation in these proceedings of $52,500.

Melvin L. Emerich, Robert P. Minton and Leo J. Sheridan constituted a committee for the protection of the hold-

ers of debentures of Utilities, known in these proceedings as the "Emerich" Committee. Upon Mr. Emerich's death, Maurice H. Stans took his place. The committee served for more than eleven years. It held over thirty-five formal meetings and many informal ones. It or its representatives took part in most if not all of the proceedings before the Commission and before the court and the Master. In addition thereto it took a leading role, inter alia, in what became known as the "Negative Pledge Clause" litigation. It examined and recommended the rejection of various plans of reorganization proposed from time to time and objected strenuously to plans for the merger of Gary Heat and Hobart Light into Northern Indiana, plans eventually abandoned by the proponents. It participated actively in the compromises of the intercompany claims.

The members of the committee and Mr. Emerich's administratrix request compensation totalling $51,000. This request seems too high despite the substantial services rendered. The Commission has recommended that Mr. Minton and Mr. Sheridan each receive compensation in the amount of $7,500 and that Mr. Emerich's executrix shall also receive the sum of $7,500. These suggested allowances seem reasonable and adequate. Accordingly they will be allowed. I shall discuss certain aspects of the applications of Mr. Emerich's administratrix and of Mr. Minton at a later point in this opinion. Mr. Stans, a partner in Alexander Grant & Company, accountants for the Committee, has sought no compensation as a member of the committee.

Samuel A. Ettelson, Leonard B. Ettelson, and Cravath, Swaine & Moore, are counsel for the Emerich Committee. They have filed a joint petition and have requested compensation in the sum of $175,000. William Prickett who also represented the Emerich Committee has requested compensation in the sum of $45,000. The Messrs. Ettelson, Mr. Painter and other partners or associates of Cravath, Swaine & Moore represented the committee generally, while Mr. Prickett was retained to represent the committee in respect to one specific matter, viz., "Negative Pledge Clause" litigation. Altogether more than twenty-four lawyers, members of or associated with the Chicago and New York firms, participated in the representation of the committee and expended over 13,500 hours on behalf of the committee. These labors commenced in June, 1934, and continued until about the middle of May, 1945. The services rendered by the Chicago and New York firms are described in 183 paragraphs of a petition 71 pages in length. That these services were important and contributed to the successful result achieved in this case may not be doubted. There seems, however, to have been duplication of effort and though I am convinced that this in a large part was unavoidable, the compensation to be allowed must reflect that condition.

Mr. Prickett's petition shows that he in fact conducted, though with the assistance of certain of his associates, the "Negative Pledge Clause" litigation. This actually embraced five different lawsuits. These were most complicated in their nature and consumed more than a year of this applicant's working time.

The Commission has recommended for all counsel representing the Emerich Committee compensation in the sum of $125,000, and has suggested that Mr. Prickett be allowed $30,000 of this total and that the balance be divided between the Chicago and the New York firms. I accept this recommendation and this division as fair and reasonable. Accordingly Ettelson and Ettelson and Cravath, Swaine & Moore will be allowed the sum of $95,000 and Mr. Prickett will be allowed the sum of $30,000.

Alexander Grant & Company, accountants for the Emerich Committee, have requested compensation in the sum of $16,220.50. The Commission has recommended that they be allowed this sum which includes certain expenses such as the typing and preparation of schedules and other material for the use of the committee. I have noted the fact that Mr. Stans who took Mr. Emerich's place on the committee is a member of the accounting firm. The compensation requested by the firm will be allowed.

City National Bank & Trust Company of Chicago served as depository for the debentures represented by the Emerich Committee. It is requested that payment of compensation be made to it in the sum of $11,500.20. The Commission has recommended payment of the sum requested. I find the amount to be reasonable, and accordingly this allowance will be made.

■ Charles T. Mordock, Hugh R. Partridge and William R. Basset constituted a committee for the protection of the holders of 6% and 7% Cumulative Prior Lien Stock of Utilities, generally known in this proceeding as the "Basset" Committee. The committee has requested compensation in the sum of $60,000. Various investment trusts belonging to The Association of Investment Trusts of London, referred to hereinbefore, hold a substantial number of shares of the prior lien stocks. Mr. Basset and Mr. Partridge had acted previous to these proceedings for Robert Fleming & Company, Litigated, as to certain English investments in the United States. The committee was organized on October 20, 1936, and first employed Martin Taylor as its counsel. Mr. Taylor's representation of the committee was taken over in May, 1941, by Curtis, Mallet-Provost, Colt and Mosle, and in particular by Clarence U. Carruth, Jr. Mr. Taylor seeks no compensation, and that of Curtis, Mallet-Provost, Colt and Mosle will be discussed hereinafter.

The committee accomplished a useful result. It took the position, as did its counsel, that the stockholders whom it represented were entitled to a preferred position by virtue of the decision of the Supreme Court of the United States in Standard Gas & Electric Co., supra, and demonstrated an unwavering attachment to this view. In 1938 the committee applied to Judge Nields for an order requiring the appointment of a separate trustee or trustees for Utilities, an application supported by the Commission but apparently opposed by some of the other interested parties. A little more than a year later the committee opposed the appointment of a temporary cotrustee of United as a permanent trustee on the ground of disqualification under the Chandler Act. This opposition, supported by the Commission, was successful. The committee set its face against certain plans for reorganization which it believed to be ill-advised and throughout occupied itself with studies of other possible reorganizations. The Commission takes the position that the committee's request for compensation is far too high and suggests compensation for Mr. Basset in the amount of $4,500. That the committee's request is too high seems certain. On the other hand I am of the opinion that the Commission's recommendations are too low. The committee showed an independence of view, a strength of resolve and an enlightened self-interest which should be encouraged. Paradoxically, however, for reasons which are set out at a later point in this opinion, I conclude that Mr. Mordock and Mr. Partridge may not be compensated. I will, however, allow Mr. Basset $10,000 for his compensation as a member of the committee.

The compensation of Curtis, Mallet-Provost, Colt and Mosle, and in particular that of Mr. Carruth, has been the subject of two hearings and of much argument. The firm's original petition for compensation was ineptly drawn in that it listed Mr. Carruth as a member of the firm without reference to the date at which he became such. Mr. Carruth became a partner only after the plan of reorganization had been approved by the court. I am convinced that he had no intention of deceiving the court as to his status in his firm by the form of the application as first filed and I understand that the Commission does not presently contend to the contrary. The original petition has been corrected by an amendment and therefore I must determine the single question of what the firm's services were worth.

■ Curtis, Mallet-Provost, Colt and Mosle began their representation of the Basset Committee on May 15, 1941. It is not necessary to state the services theretofore rendered to the committee by Mr. Taylor, who had no connection with the present applicants, since he seeks no compensation. In general the applicants including Mr. Carruth performed those services which competent counsel ordinarily perform for a stockholders protective committee. But Mr. Carruth rendered a particular service. From the present writer's earliest connection with the case, Mr. Carruth insisted that the Prior Lien stockholders clearly were entitled to a preferred position under the doctrine of subordination of the "Deep Rock" case. Mr. Carruth made this point in season, and, if a spirit of advocacy is ever inappropriate in a hotly contested litigation, he may be said fairly to have made it out of season. He saw the legal situation in black and white and sans the shadows so apparent to the court. Mr. Carruth entertained no doubt that, if the intercompany claims were litigated, his views would prevail. For this reason he took the position that adjudications of the intercompany litigations were essential. In this he was correct

to a large degree. The determination by the Master of these claims was essential to the working out of compromises by the affected parties. Mr. Carruth, however, desired all substantial claims to be adjudicated by the court and therefore he must be deemed to have overshot the mark for such adjudications were not essential. From what has been said it is apparent that he rendered unfaltering service to his clients. The Commission takes the view that Mr. Carruth's services were over-zealous and hindered the reorganization rather than aided it. Its counsel asserts that Mr. Carruth would not state, at least until the very end of the negotiations, what his clients would take by way of compromise and that his intransigent attitude obstructed the reorganization. The court is not convinced, however, that Mr. Carruth's spirit of advocacy hindered the reorganization to an appreciable extent. The prior lien stockholders of Utilities seemed to the court at first to be far removed from the feast. But their participation under the plan of reorganization as finally consummated may amount to as much as $2,000,000 by conservative estimate. Conceivably it may run much higher. It cannot be said fairly that the efforts of the Basset Committee or of Mr. Carruth created these values, but in my opinion they made a substantial contribution thereto. Curtis, Mallet-Provost, Colt and Mosle have requested compensation in the sum of $110,000. This is too high. The Commission has recommended compensation to them in the sum of $20,000. This is too low. Upon consideration of all the factors involved I conclude that the sum of $40,000 would be reasonable compensation for these applicants. This will be allowed to them.

James R. Morford and Josiah Marvel, Jr., now Marvel & Morford, represented the Basset Committee as local associate counsel. Their representation commenced on or about November 1, 1936, at a time when the committee was represented by Mr. Taylor. The firm took an active part in the representation of the committee before this court and the Master. The applicants were active advocates of the "Deep Rock" doctrine before that principle was crystallized by the Supreme Court in the Taylor case. As I have indicated, the insistence of the Basset Committee and its counsel, including these applicants, on the applicability of the doctrine of subordina-

tion was an important contribution to the effectuation of the reorganization and the allocation of substantial value to the prior lien stocks of Utilities.

The applicants also took the position that Utilities was entitled to separate and distinct representation by way of trusteeship from United. I shall not deal in further detail with the services rendered by the applicants but they were in fact substantial. The most important of them, however, were rendered prior to October, 1942, and the services which the applicants contributed to the reorganization after this date may be described fairly as more or less routine. I note that the compensation presently to be allowed covers not only the services of the present firm of "Marvel & Morford", but the antecedent firm of "Marvel, Morford, Ward and Logan." Though the applicants did not keep time sheets I think that the estimate of 200 days spent in and about the business of their clients is conservative. The applicants have requested compensation in the sum of $25,000. The Commission has recommended compensation in the sum of $10,000. This is on the low side. Compensation in the amount of $12,500 would be fair and reasonable. This amount will be allowed to them.

Guaranty Trust Company of New York was the depository under the deposit agreement executed by the Basset Committee. The applicant has requested compensation in the amount of $13,390.80 which includes compensation for the services of City National Bank & Trust Company as subagent. This amount is recommended by the Commission. It will be allowed as requested.

Arthur Andersen & Co., public accountants, have petitioned for allowance of compensation and for reimbursement of certain expenses. This firm served Messrs. Southerland and Hartt, trustees of Utilities, as hereinbefore stated, and the charges and expenses are reasonable. They amount to $3,200. Payment has been recommended by the Commission. It will be made in the amount requested.

Elbridge Lennon Lord has filed a petition requesting additional compensation in the sum of $15,325. Mr. Lord was an accountant employed by Messrs. Southerland and Hartt. They have recommended additional compensation for him in the sum of $10,000. The history attendant upon

Lord's request need not be set out in this too lengthy opinion. No substantial legal question is involved since Chapter X requires the court to fix or approve expenses of administration as well as fees. Mr. Lord will be allowed additional compensation in the sum of $10,000.

Messrs. Southerland and Hartt have also requested compensation for Mr. Edward B. Hall in the sum of $1,000. Mr. Hall rendered services to the Utilities trustees in connection with the hearing before the Commission. The amount requested will be allowed.

Messrs. Southerland and Hartt have requested that compensation be paid to Mr. Arthur L. Mathis in the amount of $2,500. It is unnecessary to state the details of this application. The amount requested will be allowed.

Judge Morris as one of the original trustees of Utilities and as trustee of United has requested additional compensation for Miss Bertha R. Nightingale in the amount of $7,500. I shall not set out here the services rendered by Miss Nightingale. I entertain no doubt that the additional compensation requested for her is reasonable and it will be allowed.

Insofar as allowances have been made to applicants because of services rendered to both estates, the court adopts for these proceedings as a rule of thumb and to facilitate such bookkeeping as may be necessary the principle that there shall be paid to such applicants from the respective estates the proportion which the sums requested by the applicants in effect from the individual estates bear to the total of the sums requested by these applicants from the estates, requests for compensation and requests for expenses being treated separately.

A number of applications for compensation made by members of committees have been denied or require further discussion. The application of one counsel for a committee has not been referred to. Since a substantially identical principle of law governs these applications it has seemed appropriate to deal with them at one time, setting out, however, the facts pertinent to each.

The first of these applications is that of Mr. George N. Lindsay. He is chairman of the committee for the protection of the holders of the $3 Preferred stock and the $6 Preferred stock of United. Mr. Lind-

say served as chairman of his committee for about eight years. He has five children and throughout the period 1940-1941, at times which need not be specified, each child with his or her own money purchased 20 shares of the preferred stock of Public Service Company of Indiana, an important subsidiary of United. The purchases were made at the direction of the applicant. At the time of their purchases two of the children, the eldest son and a married daughter, were above twenty-one years of age. The other three children were under twenty-one. The stock purchased (or its equivalent) was sold in 1942 and each child achieved a profit of about $490. Mr. Lindsay had not been appointed guardian for his children and he was not a trustee for them.

In 1940 Mrs. Lindsay bought 150 shares of the preferred stock of Public Service Company of Indiana which she disposed of in 1942 at a substantial profit. Mrs. Lindsay employed her own funds for the purchase. Mr. Lindsay stated that he did discuss Mrs. Lindsay's business affairs with her "just as much as she will let me".

In the first affidavit filed by Mr. Lindsay he did not disclose these facts. He volunteered them, however, on the first day of the hearing. He is not a member of the bar and I accept his statement that he did not at first realize their significance.

On October 24, 1939, Mr. Lindsay purchased 50 shares of the preferred stock of Public Service Company of Indiana at a cost of $3,215.75. He sold these shares on November 10, 1939, for $3,473.50, realizing a profit of $257.75. He has stated that he made this purchase as an accommodation for a friend who was a broker and who desired to develop over-the-counter business.

Mr. Lindsay is the president, director and a voting trustee of Swiss American Corporation. He holds 2 of the presently outstanding 500 voting trust certificates of that corporation but he receives no part of any profits earned by the corporation. In July, 1941, following the approval of the consolidation plan of Public Service Company of Indiana, Swiss American Corporation engaged in certain arbitrage transactions in the ordinary course of business by purchasing in the open market preferred stock of Public Service Company of Indiana and the preferred stock of Central Indiana Power Company, the latter company being one of the companies consoli-

dated into Public Service Company of Indiana. Swiss American Corporation sold in the open market the new securities issued for these preferred stocks. The arbitrages were executed with the funds of Swiss American Corporation. The corporation also participated in syndicates engaged in debt refunding operations for Public Service Company of Indiana and Northern Indiana Public Service Corporation, a subsidiary of Utilities, in the years 1939 and 1943, respectively.

The second of the applications which require discussion herein is that of Mr. Hugh R. Partridge, a member of the protective committee for the holders of the Prior Lien stocks of Utilities. In the affidavit attached to his petition Mr. Partridge states that his wife purchased through her brokers 200 shares of 6% Prior Lien stock of Utilities for $285.20 on March 13, 1939; that she sold this stock on July 25, 1939, for $1,365.67; that prior to her marriage she was employed by a financial house and has been accustomed to conducting her own business affairs and making her own decisions; and that Mrs. Partridge's account was solely for her own benefit and that the applicant "has not now and never has had any interest therein direct, or indirect, beneficial or otherwise." Mrs. Partridge testified that she purchased the stock with her own "inherited" money. She stated, however, that she "always" acted on her husband's advice; that she knew that he was a member of the committee; that she had discussed the purchase of the Prior Lien stock with her husband and that she purchased it "on the basis of what he said" about it. She also testified that though the funds with which she purchased the securities were entirely her own, she deposited the profits of her brokerage account in her banking account; that from this banking account, Mr. Partridge having none, she paid the family expenses. She also testified that when a security was sold the funds were kept in the brokerage account and not put in the checking account.

The two statements last referred to, of course, are in contradiction. It is plain from Mrs. Partridge's testimony, however, that she knew little about investments and paid little heed to them but did what her husband told her to do in respect to them. Mr. Partridge had her power of attorney to handle the brokerage account and therefore, for all practical purposes, could handle it as if it were his own. Certainly it may be said with justice that the profit received from the sale of the prior lien stock by Mrs. Partridge represented a "family asset" in which Mr. Partridge was financially interested. It is perhaps only coincidence that the purchase of the stock was made within approximately two weeks after the announcement by the Supreme Court of its decision in the Taylor case. Such coincidences are, however, unappealing to a court of equity.

Mr. Charles T. Mordock was also a member of the Protective Committee for the Holders of the Prior Lien Stock of Utilities. On April 1, and April 2, 1937, he purchased 200 shares of the 6% Cumulative Preferred Stock of Northern Indiana Public Service Company, a Utilities subsidiary, for $17,787.50. He held these shares until the latter part of October, 1944, when he exchanged them for shares of the 5% Cumulative Preferred stock of Utilities. The value of the stock which he received in exchange at the time of the hearing was about $21,000. At the time of the hearing Mr. Mordock still held these shares.

Mr. Harold Evans was the attorney for the Protective Committee of Utilities Debentures consisting of James P. Magill, Charles A. Ernst, Jr. and Philip S. Sweetser, called the "Philadelphia" committee. The committee has requested no compensation for its members. Mr. Evans represented the committee from November 1, 1934, for a period of about eleven years.

His petition, however, candidly sets forth that on certain dates in 1936 and 1937, prior to the effective date of the passage of the Chandler Act, June 22, 1938, adding Section 249 to the Bankruptcy Act, he purchased 100 shares of the 7% Preferred Stock of Northern Indiana Public Service Company and held this stock until it was redeemed in October, 1944. He prays that if this purchase be deemed to fall within Section 249 of the Act that the purchase be approved by the court.

Mr. Evans is cotrustee with the National Bank of Germantown & Trust Company under a deed of trust of Richard P. Brown for Edith G. Brown. In 1935 the trustees purchased $10,000 face amount of the 5% bonds of Gary Electric & Gas Company, then a subsidiary of Utilities, for $8,950.-70. These bonds were redeemed in March, 1942, at face. In August, 1936, Mr. Evans, as cotrustee with Provident Trust Company of Philadelphia, under a deed of trust of

Rena Davis, she being the beneficiary, purchased 15 shares of the 6% Preferred Stock of Northern Indiana Public Service Company for $1,244.25. These shares were held until October, 1944, when they were redeemed for $1,612.50, netting a profit of $368.25.

Prior to June 9, 1934, the applicant's wife, Mrs. Sylvia Evans, owned $5,000 face amount of Utilities 6% debentures. In June, 1945, as provided by the plan of reorganization, she exchanged these securities for stocks of Midland Utilities Company and Midland Realization Company. Prior to June 9, 1934, Mrs. Evans also held 50 shares of the 6% preferred stock of Northern Indiana Public Service Company. She exchanged these shares in September, 1944, pursuant to an exchange offer of the company, for 50 shares of its 5% preferred stock. In July, 1935, Mrs. Evans purchased 50 warrants, each entitling her to 15 shares of the common stock of Gary Electric & Gas Company for the sum of $2,250. In 1935 Gary Electric issued to Mrs. Evans 750 shares of common stock for these warrants. She sold the shares to the company in February, 1942, for $4,875, gaining a net profit of $2,625. In October, 1935, Mrs. Evans purchased 50 shares of 6% preferred stock of Northern Indiana Public Service Company for a price of $3,425. In September, 1944, she exchanged these shares pursuant to the company's offer for 50 shares of the company's 5% preferred stock. In January, 1936, Mrs. Evans purchased $5,000 face amount of the First and Refunding Mortgage 5% bonds of Northern Indiana Public Service Company for $5,105. She held these until they were redeemed by the company in December, 1939, for $5,250. She invested the proceeds of the redemption plus $124 in 50 shares of Northern Indiana Public Service Company 7% preferred stock. She held these shares until they were redeemed in October, 1944, for $5,750. In December, 1936, Mrs. Evans purchased 50 shares of the 7% preferred stock of Northern Indiana Public Service Company for $4,950 which she held until they were redeemed in October, 1944, for $5,750. She realized a net profit of $800. The investments were made with her own funds. Mr. Evans did not testify that he had not advised her in respect to the purchase of these securities. In his supplemental affidavit, filed at the suggestion of the court, setting out his wife's transactions in the securities, he made no statement as to whether or not he had advised her to purchase the securities.

Mr. Evans' petition states also that one of his law partners, acting on the advice of his own investment counsel, purchased and sold certain securities of companies owned or controlled by Utilities; that the partner was unaware that the companies were under the control of Utilities and that he did not know until May 10, 1945, when informed by Mr. Evans, that the purchase and sale of these securities by him could have any possible effect on Mr. Evans' application for fees. Specifically, the partner referred to in October, 1938, purchased $5,000 principal amount of Northern Indiana Public Service Company First and Refunding Mortgage bonds for $5,263.35 and sold them on December 29, 1939, with a net loss of $13.35. On January 29, 1940, Mr. Evans' partner purchased $3,000 face amount of Gary Electric & Gas Company First Lien Collateral bonds for $3,034.30 and sold these bonds on March 24, 1942, for $3,000, incurring a net loss of $34.30. On February 8, 1940, the applicant's partner purchased $1,000 face amount of Gary Electric & Gas Company First Lien Collateral bonds for $1,011.56 and sold them on March 24, 1942, with a net loss of $11.56. The applicant states that the partner will share in any fee allowed him "unless it shall hereafter be judicially determined that he is barred from such compensation by Section 249 of the Bankruptcy Act, in which event he will not share therein."

The last group of applications (Mr. Blagden's, Mr. Minton's and that of Mr. Emerich's administratrix) will be discussed as one. Mr. Blagden, Mr. Emerich and Mr. Minton were partners in brokerage firms which executed commissions to buy or sell small quantities of the securities of United and of Utilities or securities of subsidiaries or affiliates of the debtors for the accounts of their clients and not for the accounts of the partners. There is nothing in the record to indicate that these transactions were carried on other than in the ordinary course of business or that any of the applicants or their partners inspired the purchase or sale of the securities in order to gain the small commissions to be achieved from such purchase or sales or in anywise sought dealings in the securities. Indeed, there is nothing to indicate that any member of this group of applicants had knowledge, until long after the event,

that their brokerage houses were dealing in the securities.

The foregoing is a statement of the facts relevant to the applications of Messrs. Lindsay, Partridge, Mordock, Evans, Blagden, Mr. Emerich's administratrix and Mr. Minton. A discussion of the applicable principles of law follows.

It is the settled law of this Circuit in proceedings brought pursuant to Section 77B of the Bankruptcy Act that a District Court possesses the power and should exercise its discretion to deny compensation to any person who, assuming a fiduciary relationship to the security holders of the corporation in reorganization, has purchased or sold the corporation's securities. So much is clear. See In re Mountain States Power Co., 3 Cir., 118 F. 2d 405, 407-408. The duty of the fiduciary thus declared is really no different than that required by the law of trusts. The principle involved means neither more nor less than that a fiduciary may not serve conflicting interests. "It is no answer to say that fraud or unfairness were not shown to have resulted." Woods v. City Bank Co., supra, 312 U.S. 262, at page 268, 61 S.Ct. 493, 85 L.Ed. 820. Section 249² of Chapter X explicitly imposed on a fiduciary acting in a reorganization proceeding the standards imposed upon fiduciaries by the law of trusts. Section 249 is a remedial statute and its legislative history demonstrates clearly its intended scope.³ The test of whether the fiduciary had profited by reason of inside information was eliminated and a blunt "rule-of-thumb" was adopted by Congress at the suggestion of the Securities and Exchange Commission.⁴ That rule means that if a person acting in a fiduciary capacity in the proceeding buys or sells the securities of the debtor he shall be barred from compensation in the reorganization proceeding. The bar to compensation will operate despite the fact that the fiduciary did not profit from his dealing in the debtor's securities. The bar is to be applied despite the fact that there is no suggestion of fraudulent conduct on the part of the fiduciary. See in re Reynolds Investing Co., 3 Cir., 130 F.2d 60, 61, 62.

I will endeavor now to deal with the mixed questions of law and fact presented by the applications under consideration. They may be phrased as follows:

(1) Will the fact that the securities traded in are those of underlying companies, subsidiaries or affiliates of United or Utilities⁵ (rather than the securities of United or Utilities) relieve the bar against compensation?

I conclude, as did Judge Kirpatrick in In re Philadelphia & Reading Coal & Iron

---

² Section 249 is as follows:

"Any persons seeking compensation for services rendered or reimbursement for costs and expenses incurred in a proceeding under this chapter shall file with the court a statement under oath showing the claims against, or stock of, the debtor, if any, in which a beneficial interest, direct or indirect, has been acquired or transferred by him or for his account, after the commencement of such proceeding. No compensation or reimbursement shall be allowed to any committee or attorney, or other person acting in the proceedings in a representative or fiduciary capacity, who at any time after assuming to act in such capacity has purchased or sold such claims or stock, or by whom or for whose account such claims or stock have, without the prior consent or subsequent approval of the judge, been otherwise acquired or transferred."

³ See H.R.Rep.No.1409, 75th Cong., 1st Sess., p. 46: "Any person seeking allowances must file with the court a sworn statement showing what if any trading he did in securities of the debtor and compensation is to be disallowed if there has been such trading during the proceeding by those in representative or fiduciary capacities."

⁴ See the testimony of the Honorable William O. Douglas, then Chairman of the Commission: " * * * We started to set this [provisions which became Section 249] up in another way, to say that if a person in a fiduciary capacity uses inside information to purchase or sell securities, then he shall be penalized, but we got into a lot of difficulties in determining in a particular case whether or not actual inside information was used, and so we decided that the best practical way of doing it was to broaden the base a little bit and establish a rule of thumb and follow the pattern of the Paramount case [In re Paramount-Publix Corporation, D. C., 12 F.Supp. 823] and the Republic Gas case [In re Republic Gas Corporation, D. C., 35 F.Supp. 300]." Hearings before the Committee on the Judiciary House of Representatives, 75th Cong. 1st Sess. on H.R.6439 as amended and reported as H.R.8046, June 3, 1937 at p. 184 et seq.

⁵ It will be borne in mind that Utilities technically at least was a subsidiary of United, that is to say, United was the top holding company of this group of "In-

Co., D.C., 61 F.Supp. 120, 128, that "the 'direct or indirect' provision of section 249 refers * * * to the character of the interest acquired or transferred by the claimant for compensation * * *." The learned District Judge suggested as an apt example the "trading in stock of a holding corporation owning stock or bonds of the debtor." I can perceive no substantial degree of difference in the application of the principle whether one looks upstream or down. The holder of securities of a subsidiary or an affiliate of a debtor is in an adversary position to the debtor in the sense that the debtor's equity in the assets of the subsidiary or the affiliate necessarily is subordinate to his own. The interest of such a security holder cannot parallel that of the debtor and therefore, if the security holder be a fiduciary of the debtor he has placed himself in a position of conflict. Indeed the fiduciary of a debtor by purchasing the securities of its underlying companies might render a reorganization a practical impossibility by foreclosing upon the assets of a subsidiary, thus depriving the debtor of equity. Congress was aiming at a number of evils including those just described.[6] It is not a defense in the instant case to assert that no damage or injury to the debtors was intended or effected and that the reorganization was not impeded by the purchases of securities by the fiduciaries. The point is that a fiduciary must not subject himself to conflicting interests.

■■■■ For the reasons stated I entertain no doubt that a fiduciary who, during the course of the reorganization, deals in the securities of corporations subsidiary to or affiliated with the debtor, may be barred from compensation.

■■■■ (2) Will the fact that the securities were purchased by members of the immediate family groups of the fiduciaries (rather than by the fiduciary himself) relieve the bar against compensation? The purchase of securities of a debtor in reorganization or the purchase of securities of subsidiaries or affiliates of a debtor by a member of the immediate family group of a fiduciary, at least under the circumstances at bar, amounts in substance to an extension of the income of the fiduciary himself. Bearing in mind the legislative history of Section 249 and the fact, which I have stressed, that as remedial legislation the statute is entitled to a liberal construction, I conclude that it was the intent of Congress to prohibit compensation to a fiduciary, the members of whose immediate family have dealt in the securities of a debtor or in those of a subsidiary or affiliate of a debtor. If the construction of the statute were otherwise a most fertile field would be opened to a fiduciary to profit the members of his family and thus to enhance his own economic position by reason of his status as a beneficiary. Cf. In re Philadelphia & Reading Coal & Iron Co., supra. As has been indicated repeatedly in this opinion it is my conclusion that Section 249 codifies what may be described as the law of trusts. I think it is established beyond doubt by the law of trusts that not only may a trustee not deal with property of his cestui for his own personal benefit but that he may not permit members of his immediate family group to deal therein, whether the cestui incurs damage or profit from such dealings.

I conclude therefore that compensation must be denied to a fiduciary, the members of whose immediate family deal in the securities of a debtor or in the securities of a subsidiary or an affiliate of a debtor.

■■■■ (3) As to the purchase and sale of securities by Mr. Evans' partner, I do not question the correctness or accuracy of Mr. Evans' statement that his partner made the purchases by reason of information received by him from a completely independent source and that the fiduciary was not aware of his partner's purchases. No discussion of the law of partnership or of the issues conceivably involved is necessary. It is sufficient to state here that since the fiduciary will not be granted compensation for the reasons set out in (1) and (2), supra, no fee from these proceedings will

sull" companies. For the purpose of the questions presently before me the subsidiaries or affiliates of United or Utilities need not be distinguished. They must be dealt with as a composite.

6 See H.R.Rep.No.1409, 75th Cong., 1st Sess. "Revision of the National Bankruptcy Act", and the remarks of Chairman Douglas, pp. 37-38. Cf. the fact that it was noted at a session of the subcommittee of the Senate Judiciary Committee, (Hearing Before a Subcommittee of the Committee on the Judiciary, United States Senate, 75th Cong., 2nd Sess. on H.R. 8046 on January 18, 1938, pp. 80-81) that Section 249 did not by its terms provide sanctions against trading in securities of subsidiaries of a debtor.

come into the partnership in which the fiduciary's partner might share. Further statements would be futile.

■ As to the arbitrage transactions carried out by Swiss American Corporation, I conclude that these dealings also will cause the bar of the statute to operate against Mr. Lindsay. In so deciding I am aware that the profit of the arbitrages was for the account of the corporation and not for Mr. Lindsay's own account and that he did not receive any monetary profit from these transactions. The corporation of which he was the virtual head did profit from them, however, and there was the advantage to Mr. Lindsay which comes to any corporation president whose company completes a successful venture.

I conclude that the "direct or indirect" provisions of Section 249 cover the arbitrages, but if they did not I should hold that the law of trusts would operate to bar Mr. Lindsay from compensation. He who undertakes to act as a fiduciary must so conduct himself that no act of his, however innocent in intent, will place him in a dual position, one of possible conflict with his duties as a fiduciary.

For the reasons stated compensation will be denied to Messrs. Lindsay, Partridge, Mordock and Evans.

■ (4) As to the last group of applications (Mr. Blagden's, Mr. Minton's and that of Mr. Emerich's administratrix) I conclude that there is no bar to compensation under the circumstances of the instant cases. Though brokerage houses in which these committee members were partners dealt to a small extent in the securities of the debtors or in the securities of subsidiaries or affiliates of the debtors, these dealings were for the accounts of customers and the fiduciaries did not inspire them. Compare the Swiss American Corporation transactions. The transactions of the brokerage houses, in which Mr. Blagden, Mr. Minton and Mr. Emerich were partners, were of such a nature that the maxim de minimis non curat lex should be applied to them. Neither Section 249 nor the law of trusts as to duality of intersts of fiduciaries, if the provisions of the former and the legal effect of the latter be not identical, will bar compensation to the applicants in this group.[7]

■ Careful consideration has been given to the question of whether the court may confer "subsequent approval" upon the transactions referred to which affect the compensation of Messrs. Lindsay, Partridge, Mordock and Evans. I have concluded that it may not be conferred. See Otis & Co. v. Insurance Bldg. Corporation, 1 Cir., 110 F.2d 333. Subsequent approval may not be granted in respect to transactions in which securities were purchased by fiduciaries. Such approval is limited to transactions in which securities were "otherwise acquired."

■■ It is necessary also to deny reimbursement of out-of-pocket expenses to Messrs. Lindsay, Partridge, Mordock and Evans. As I read Section 249 reimbursement of out-of-pocket expenses may not be granted to fiduciaries who have dealt in securities unless their dealings be approved by the court. The result, however, will not work great hardship on the Basset Committee for, two items excepted, all disbursements, totalling $3,365.44, were made by Mr. Basset who is not barred from compensation. Two items, one under date of October 12, 1937, representing Mr. Partridge's traveling expenses in the sum of $18.50, and another under date of Decem-

---

[7] Compare the foregoing rulings with Rule U 62 of the Securities and Exchange Commission.

Acting pursuant to Sections 11(g) and 12(e) of the Public Utility Holding Company Act of 1935, the Securities and Exchange Commission on July 26, 1937, adopted rules and regulations which prohibited proxy solicitations unless the instruments contained provisions prohibiting trading by any person in a fiduciary relationship in any securities of a company that was undergoing reorganization. See Holding Company Act Release No. 759. Later, on February 6, 1940, the Commission amended the rule and extended the prohibition to the securities of a subsidiary or an affiliate of any company within the purview of the Act in reorganization and also prohibited the rendering of advice with respect to such securities by anyone in a fiduciary relationship. See Holding Company Act Release No. 1915. The present rule became effective July 15, 1941, and is usually designated as Rule U 62, which prohibits trading in securities of companies in reorganization or their subsidiaries or affiliates by or for any person in a fiduciary relationship whether as principal, agent, trustee or otherwise or in any transaction in which such person has a direct or indirect beneficial interest. See Holding Company Act Release No. 2836.

**418**

ber 18, 1940, representing Mr. Mordock's traveling expenses, in the sum of $94, may not be reimbursed. Mr. Basset therefore will be reimbursed to the extent of $3,252.-94. The expenses of the Lindsay Committee amount to $408.58. Messrs. Farwell and Blagden are in nowise disqualified from compensation. I conclude therefore that it would be just to·allow approximately two-thirds of the committee's disbursements, or an amount of $275. Mr. Evans may not be reimbursed for his out-of-pocket expenses. This does work hardship upon him, for his services were performed skillfully and well. The bar of the statute, however, may not be set aside.

 All of the requests for reimbursement set out in all other petitions filed by the applicants will be allowed as prayed for with the exception of the amount of $101.20 requested by Cadwalader, Wickersham & Taft in their supplemental application for reimbursement. This sum represents out-of-pocket expenses incurred by the applicants in connection with attendance before this court at the hearing on the applications for allowances. The expenditure of these sums does not so directly benefit the estate as to be allowable. The rule laid down by Judge Nields in Matter of ·Celotex Co., D.C., 13 F.Supp. 1011, 1013, is a salutary one and the court will adhere to it.

A decree may be submitted.