WEIL ET AL. *v.* NEARY.

No. 59. Argued October 26, 1928.—Decided January 2, 1929.

---

*Mr. A. Leo Weil,* with whom *Messrs. J. G. Milburn, Jr.,* and *Louis Salant* were on the brief, for petitioners.

*Mr. Louis Marshall* for respondent.

MR. CHIEF JUSTICE TAFT delivered the opinion of the Court.

In May, 1921, Neary, a citizen of New York—assignee of Samuel Untermyer and acting for him—brought suit in the Supreme Court of that State for more than $70,000, against A. Leo Weil and Charles M. Thorp, citizens of Pennsylvania. The defendants removed the cause to the District Court for the Southern District of New York, on the ground of diverse citizenship. In oral argument it was conceded that Untermyer is the real party in interest as plaintiff, so we shall hereinafter refer to him as such.

By his complaint, amended by leave of court to conform to the evidence, Untermyer alleged that he had been retained as attorney and counsel for many creditors of one Josiah V. Thompson, a Pennsylvania banker and coal operator, to collect indebtedness amounting to millions of dollars. To that end Untermyer retained the defendants, Weil and Thorp, of Pittsburgh, to conduct bankruptcy proceedings under his supervision, upon an agreement that they were to accept $5,000 in full payment for their services. Such proceedings were accordingly instituted against

162

Thompson on the petition of three creditors in the District Court of the United States for the Western District of Pennsylvania and he was adjudicated a bankrupt. Trustees were chosen and Weil and Thorp were selected as their counsel.

Plaintiff's complaint avers that because of complications which arose it was thereafter agreed that the compensation of the defendants for services in the bankruptcy proceedings should not be limited as stipulated, and that the plaintiff and his firm, Guggenheimer, Untermyer & Marshall, should collaborate with the defendants under the supervision of the plaintiff in the performance of services to the trustees. Also that the defendants should retain, out of allowances eventually made by the bankruptcy court in payment for their services, such sum as the plaintiff considered just and equitable, the remainder to be paid to Untermyer himself. Pursuant to this agreement the defendants continued to render services in the bankruptcy proceedings under the general supervision of the plaintiff, for which seven allowances were made and paid to them out of the bankrupt estate, from July 18, 1919, to May 10, 1924. The complaint further alleges that, in pursuance of the contract, the plaintiff fixed a fair and reasonable division between plaintiff and defendants but that they refused to pay the plaintiff the sums claimed under that division.

Weil and Thorp filed separate answers. They denied that there was any agreement, express or implied, between the plaintiff and them regarding the performance of services after appointment of the trustees in bankruptcy, or regarding the compensation for services performed by them thereafter. They admitted receipt of the allowances made to them by the court, but alleged that the services rendered after their designation and confirmation as general counsel to the trustees were rendered in collaboration with other counsel and not in collaboration with or

under the direction of the plaintiff or his firm; also that any services rendered by the plaintiff and his firm were rendered as counsel to the creditors' committee and not otherwise. They further said that any such agreement or understanding as that alleged by plaintiff would have been unprofessional, contrary to public policy, illegal and void.

There was no jury. The case was referred to a referee as under the New York Practice Act, who concluded that Weil and Thorp were jointly and severally indebted to the plaintiff in the sum of $57,064, with interest from November 15, 1920. A judgment accordingly was directed.

Pursuant to a written stipulation signed and filed by the parties the court ordered:

" That the trial of the above entitled action be and the same hereby is referred to Allen Wardwell, Esq., as Referee, to hear, try and determine the same, with all the powers to act and rule upon the said trial possessed by the Court."

Requests for findings were submitted to the referee by both sides. He marked his rejection, modification or approval of each, and filed a report of his findings of fact and conclusions of law. All were approved and adopted by the court. A bill of exceptions, prepared by the defendants, was not allowed because tendered out of time. In this situation the defendants concede that they are bound by the findings.

The plaintiff contends that this Court may not examine the findings to determine whether they support the judgment, and he relies on *Campbell* v. *United States*, 224 U. S. 99. That was a common law case in a District Court at a time when no provision for waiver of a jury or for findings of fact by such court had been made by statute. Since then, §§ 649 and 700 of the Revised Statutes have been extended to District Courts. Now under § 649 if in a common law suit in a District Court the parties consent to refer the issues in accord with local practice

to a referee to make findings of fact and report conclusions of law thereon which the court approves and adopts, the appellate court may examine the findings and determine whether they support the judgment. *Shipman* v. *Straitsville Mining Co.*, 158 U. S. 356, 361; *Chicago, Milwaukee & St. Paul Ry.* v. *Clark*, 178 U. S. 353, 364; *Boogher* v. *Insurance Co.*, 103 U. S. 90, 97; *Paine* v. *Central Vermont R. R.*, 118 U. S. 152, 158; *David Lupton's Sons Co.* v *Auto Club of America*, 225 U. S. 489, 493.

A summary of the findings follows:

In 1915, Untermyer was retained as attorney for from 90 to 95 per cent. of the creditors of Thompson to collect his indebtedness out of his property, amounting to many million dollars. The affairs were greatly involved, and it was agreed among the creditors that the debtor's extensive properties should be conserved so that they might be applied equitably to the payment of the claims. In January, 1915, application was made to a state court in Pennsylvania for receivers, and they were appointed, and this held the estate together. But when the case was carried to the Supreme Court of the State on error, the receivership was set aside, on the ground that it had been erroneously created. The defendants, Weil and Thorp, had no interest in or connection with Thompson, his estate or his creditors until after the close of the receivership, when, in August, 1917, Untermyer employed Weil and Thorp to secure the adjudication of Thompson as a bankrupt, and retained the firm to initiate and carry through the proceedings under his supervision, fixing their compensation at $5,000. This was accepted, and accordingly on the petition of three of the creditors of Thompson, on September 10, 1917, he was adjudicated a bankrupt. Weil and Thorp, after their employment by Untermyer and before the bankruptcy, had helped in the effort to sell the properties under several plans, one of them called the Young plan, with the hope that all the properties could

be sold; but the plans as such failed except that there was carved out of the Young plan the sale of what was called the Frick property.

At a meeting of the creditors, trustees were selected on October 17, 1917, and their appointment was duly confirmed on the 18th. The defendants, Weil and Thorp, were, on October 18th, elected general counsel for the trustees upon their individual certifications in writing that they did not represent any interests which would in any way be antagonistic or adverse in the event that they were so employed. Untermyer, who had appeared previously in the record as counsel for the committee of creditors, was not elected counsel for the trustees and did not so certify. The certificate was filed by Weil and Thorp in accord with Rule 5 of the Rules of Bankruptcy of the District Court of the United States for the Western District of Pennsylvania:

"Attorney for the Estate and His Duties. Unless specially authorized by the court, receivers and trustees in bankruptcy shall not retain as their attorney, the attorney of the bankrupt, of the petitioning creditors, of the person applying for the appointment of a receiver, or of any creditor, and trustees shall not retain as their attorney any attorney who has obtained proxies or voted upon the election of such trustees, or who is an attorney for persons holding such proxies."

Immediately after the appointment of the trustees and their counsel, they proceeded to conclude the Frick sale. Its substantial terms had been negotiated by Untermyer as counsel for the creditors' committee prior to the bankruptcy. On closing it a written application signed by Weil, Thorp and Untermyer, was made to the bankruptcy court for the payment out of the proceeds of separate and exact compensation to Weil and Thorp, to certain associate counsel for the trustees and to Untermyer. This was subsequently approved by the court. The expected sale

of the rest of the Thompson property under the Young option was never consummated, and the expected composition in the bankruptcy did not take place.

The affairs of the Thompson estate were very complicated, and Untermyer was the person most conversant with their legal aspect. The trustees when selecting defendants as their counsel realized that they had been counsel for the committee of creditors under Untermyer.

It had become apparent that the defendants had to perform services in the settlement of the estate which exceeded those originally thought to be necessary. Thereupon the contract was made between Weil and Thorp on the one hand, and Untermyer on the other, which is set forth in the amended bill of complaint, and on which this suit was brought. The defendants continued to render services under the general supervision and with the active assistance and collaboration of Untermyer and his firm. The trustees realized large sums for the benefit of creditors.

Allowances totalling more than $142,000 were made in the bankruptcy proceedings and paid to the defendants as follows:

September 3, 1918, July 2, 1919, and July 1, 1919......... $30,500
June 1, 1920.....................................  45,466
October 27, 1920...................................  68,093

On being informed of these payments, Untermyer, on November 15, 1920, pursuant to the agreement decided that of the total sum so received the defendants should retain 60 per cent., and pay the remaining 40 per cent. to him. The defendants were duly notified of this decision, but refused to pay Untermyer any part of such receipts.

On November 30, 1920, the firm of Weil and Thorp was dissolved. Weil succeeded as counsel in the bankruptcy proceedings, and further allowances were made to him, $21,000 on May 10, 1924, and later $23,000. Although 40 per cent. of these were claimed by Untermyer, the referee

did not allow them. Untermyer had made no determination as to their division.

The referee held that the contract between Untermyer and the defendants was limited to the preservation of the estate and came to an end with the final disposition of the properties by what was called the Piedmont sales and did not apply to fees allowed Weil for services rendered in the general administration of the estate, for which the allowances of $21,000 and $23,000 had been made. Also that the interests of the creditors represented by Untermyer were identical with those of the general creditors.

Upon the facts so found we are of opinion that the contract sued on is clearly contrary to public policy and does not sustain the challenged judgment.

It is contended that in cases where a contract is attacked because contrary to public policy, the burden of proof is upon those who claim illegality, and that in such cases the principle *res magis valeat quam pereat* applies. *Hobbs* v. *McLean,* 117 U. S. 567; *Valdes* v. *Larrinaga,* 233 U. S. 705, 709; *Baltimore & Ohio S. W. Ry.* v. *Voigt,* 176 U. S. 498; *Steele* v. *Drummond,* 275 U. S. 199, 204, 206; *Canal Co.* v. *Hill,* 15 Wall. 94; *Curtis* v. *Gokey,* 68 N. Y. 300; *Dykers* v. *Townsend,* 24 N. Y. 57; *Ormes* v. *Dauchy,* 82 N. Y. 443; *Shedlinsky* v. *Budweiser Brewing Co.,* 163 N. Y. 437; *Lorillard* v. *Clyde,* 86 N. Y. 384, 387. These cases state with force the necessity for maintaining the right of freedom of contract and the objections to lightly interfering therewith. But generally they turn on the construction of words and on the rule that the presumption, where there is an ambiguity, should be in favor of validity. They have little value here. There is no doubt of the meaning of the contract.

Untermyer was counsel for many creditors. He was forbidden by Rule No. 5 before quoted to become counsel for the trustees unless specially authorized by the court. He represented 90 per cent. or more of the general creditors.

**168**

There is no presumption or finding that the bankruptcy court especially authorized Untermyer to serve as counsel for the trustees or knew that the allowances to Weil were in part for Untermyer, or that he was to divide them between Weil and himself. Had there been evidence that the court had such knowledge certainly the referee would have found it. The point was crucial. Nor is it strange that there was no such evidence. Untermyer's relations to the bankruptcy and to the creditors were such that it would have been difficult for the court to learn or infer that he had changed his activities from work for the creditors to that of the trustees without direct announcement of the change.

Many abuses have occurred in the bankruptcy practice and none is more frequent than that by which the attorney for petitioning creditors becomes counsel for the trustees subsequently appointed. This mingling of interests, frequently conflicting, is generally regarded by courts as working to the detriment of one of the parties and to the undue advantage of another. Experience has shown the wisdom and necessity of separating the function and obligation of counsel by forbidding the employment in different interests of the same person. In this way only may the court be advised how conflicting interests are represented. Rule No. 5 was adopted as an obvious safeguard. The danger of giving entire freedom of selection of counsel to the trustees lies in the temptation of the attorney for some creditors when he becomes counsel for the trustees, to use his function as representative of all the creditors, unjustly to favor or oppose particular creditors or to induce the trustees to do so. Rule 5 leaves it to the court to waive the restriction if with knowledge of the particular circumstances it appears safe so to do, but if the court does not know of a proposed departure, it has no means of protecting creditors from the danger the rule is intended to avoid.

The validity and effect of Rule 5 came before the Circuit Court of Appeals of the Third Circuit in *W. J. Robertson's Case,* 4 F. (2d) 248. One Kaufman, as counsel for certain creditors, had filed an involuntary petition for them. The receiver presented a petition to the referee for the appointment of Kaufman as his attorney. On the back of the petition there later appeared, written in lead pencil, the word "Refused." Apparently in ignorance of the refusal, Kaufman acted for the receiver without objection from anyone. He filed several papers in behalf of the receiver, and obtained orders on some of them, and in all these it was recited that Kaufman was the attorney of the receiver. When a fee of $300 was asked for Kaufman, it was disallowed by the referee. On appeal the District Court affirmed the order. Of Rule 5, now under consideration, the Circuit Court of Appeals said [p. 249]:

"The court is vested with authority to make this rule. Section 2 (15) of the Bankruptcy Act of 1898 (Comp. St. § 9586). It seems to us both wise and reasonable. . . . While on general principles the laborer is worthy of his hire, and counsel should be paid a reasonable fee for services rendered, yet the apparent retention here was a plain violation of the rule of court. It was the duty of the receiver to comply with the rules of court. Both he and the petitioner are attorneys and knew the rule. Otherwise a petition for authority to retain Mr. Kaufman would not have been presented. If the receiver and his counsel chose to act in disregard of, or in opposition to, the rule, or upon an unwarranted assumption that authority had been or would be given, they are responsible for the consequences of the refusal of authority."

It is clear that a rule of court thus authorized and made has the force of law. *Rio Grande Irrigation Company* v. *Gildersleeve,* 174 U. S. 603, 608; *Thompson* v. *Hatch,* 3 Pick. 512; *District of Columbia* v. *Roth,* 18 App. D. C., 547, 550; *Murphy* v. *Gould,* 39 App. D. C., 363, 367; *Wil-*

*kinson* v. *Walker,* 292 Fed. 395, *State* v. *Lankford,* 158 Ind. 34; *Advance Veneer Lumber Co.* v. *Hornaday,* 49 Ind. App. 83.

Early in the bankruptcy proceedings on the conclusion of the Frick sale the court allowed specific compensation to the defendants, to certain associate counsel for the trustees, and to Untermyer. This, it is suggested, shows the court knew Untermyer was receiving compensation for services to the trustees and approved such action. But this incident has no such significance. It merely indicates that the court approved an agreement between counsel to pay the expenses of the trust incurred largely before the bankruptcy, of which its indebtedness for Untermyer's services in making the Frick sale, while he was acting as counsel for the committee of creditors, was properly one. It is entirely consistent with subsequent want of information by the court that Untermyer was serving as counsel for the trustees.

The referee suggests that failure by Weil or Untermyer to advise the court of the contract sued on ought not to invalidate it, because if either had called attention to the arrangement there would have been no objection by the court. We quote from his opinion:

" The only objection that I can see to the contract was that it does not seem in terms to have been made known to the Court or to the Referee, but there is no reason to suppose that had the plaintiff or the defendant called the attention of the Court to the arrangement as made, there would have been any objection to the plaintiff sharing in these fees. Certainly the Court's or the Referee's ignorance of the agreement did not tend to increase the allowances to counsel, nor is there anything but commendation by the Referee and the Court for the services rendered to the estate by counsel, in which the plaintiff bore a considerable part, whether or not that fact was known to the Court. In any event, it does not seem to me that

the defendants can now contend that the failure to bring the matter to the attention of the Court on subsequent allowances as they did on the Frick sale can be put forward to defeat the plaintiff's contention."

We can not concur in this view. We find no reason for assuming that the District Court would not have made serious objection to the contract had it known its terms. Such an assumption would be unfair to the court. Certainly it was not for another court to determine whether the situation justified a waiver of the rule. The referee and the Circuit Court of Appeals held that it was the duty of Weil to advise the court of the contract. We think it was no more the obligation of Weil than it was of Untermyer. Both were engaging in the same violation of the rule.

There were two issues in the present case. One was whether the contract sued on was made. Weil said it was not. Untermyer said it was, and the referee has found with him. The other issue was whether the agreement between Untermyer and Weil was contrary to public policy. The referee found that both participated in the breach of the rule. Neither can be relieved from the resulting invalidity of the contract by charging that the other ought to have told the court of it.

The controversy is not an ordinary one between the two parties. The issue concerns the action of both Untermyer and Weil towards the bankruptcy court. A question of public policy is presented—not a mere adjudication of adversary rights between the two parties.

Another feature of the contract that calls for condemnation is the provision that Untermyer shall have power to supervise and direct Weil in the rendition of service to the trustees. Of this, the court certainly could know nothing. Weil's duty was to exercise his independent judgment in respect of his duties. He could not abdicate to Untermyer. The contract made the latter *dominus*

*litis,* and operated as an intolerable imposition on the judge of the bankruptcy court. This was contrary to public policy; it was in direct conflict with the professional and official duty of Weil as an officer of the bankruptcy court and counsel for the trustees.

Still another reason for condemnation of this contract is the provision under which the compensation allowed to Weil was to be divided by Untermyer between the two. The court made allowances to Weil without knowledge that a part of them was to be received and enjoyed by Untermyer. It necessarily assumed that allowances were being made to Weil and no one else. Instead of this they really were made to Untermyer, the attorney for creditors, for such division between Weil and himself as he might determine. The evils to which such a practice might lead are manifest. It would, in effect, take from the court the judicial function and vest it in an unrecognized stranger.

Both the Circuit Court of Appeals and the referee held that this provision of the contract would not tend to increase the allowance to counsel. We are unable to follow the argument. Certainly there would be a temptation to both Untermyer and Weil to seek so to increase the allowance as to secure a generous provision for both. Motive for excessive allowance could hardly be more direct.

For the protection of the estate and itself the bankruptcy court must rely largely on counsel for the trustees, as also on counsel for creditors, to keep watch against unjust charges. Under this contract there would be an obvious incentive for counsel to do otherwise.

Complaints of those interested in the honest and effective administration of the bankruptcy law led this court three years ago to adopt several new rules in respect to the compensation of attorneys, receivers and trustees. Rule 42 requires that where an attorney applies for compensation from a bankrupt estate he shall file a petition under

oath setting forth a full and detailed statement of his services, and the amount claimed therefor, to be accompanied by an affidavit of the applicant that no agreement has been made, directly or indirectly, and that no understanding exists, for a division of fees between the applicant, the receiver, the trustee, the bankrupt or the attorney of any of them; and the rule directs that no allowance of compensation shall be made in the absence of such petition and affidavit. These rules were adopted after the contract in this case was made, and therefore have no direct application here. But they clearly show the previous abuses which it was hoped to avoid by their adoption, and explain the necessity and reason for the earlier adoption of Rule 5, in the Western District of Pennsylvania, which does apply to the contract here and renders it illegal.

We have specially referred to Rule 5, under which the illegality of the contract is clear, but we are not to be understood as holding that without the rule the transaction under consideration would not be contrary to public policy and void.

The chief argument that is pressed upon us to declare the contract valid and to sustain the judgment based upon it, is the success with which the plaintiff is found to have worked out a useful settlement of the estate for the benefit of the creditors, and the absence of any finding or showing that there was actual fraud. But this is not a sufficient answer to the charge of illegality. The contract is contrary to public policy—plainly so. What is struck at in the refusal to enforce contracts of this kind is not only, actual evil results but their tendency to evil in other cases. Even if the ultimate results in the management of the Thompson estate were good, that could be no excuse for a contract plainly illegal, because tending to produce the recognized abuses which follow fraud and disloyalty by agents and trustees. Enforcement of such contracts when

actual evil does not follow would destroy the safeguards of the law and lessen the prevention of abuses. *Tool Co.* v. *Norris*, 2 Wall. 45; *Woodstock Iron Co.* v. *Richmond Extension Co.*, 129 U. S. 643; *Oscanyan* v. *Arms Co.*, 103 U. S. 261; *Meguire* v. *Corwine*, 101 U. S. 108; *Connors* v. *Connolly*, 86 Conn. 641; *Richardson* v. *Crandall*, 48 N. Y. 348; *Palmbaum* v. *Magulsky*, 217 Mass. 306, 308. But we must not be understood as implying that no harm resulted to the Thompson estate or its creditors.

We conclude that the contract set up by Untermyer in the amended petition, framed to meet the evidence, is in violation of public policy and professional ethics. Such a transaction between counsel calls for judicial condemnation. This requires a reversal of the judgment of the court below.

Where a party seeks to enforce a contract and it is found to be invalid because contrary to public policy, the usual result is that the court dismisses the action and leaves the parties as it finds them. Weil, the defendant appearing *pro se*, announced to us in open court that he would be entirely content with any disposition of the amount sued for, provided it was not appropriated to the satisfaction of a contract deemed plainly illegal and void, and the making of which he denied. He tendered his consent to any disposition of the funds in controversy which this Court might regard as proper. The difficulty with that proposal is the want of power in this case to make a disposition of the funds with due regard to the bankruptcy proceeding which is not now before this Court. We therefore must reverse the judgment below and direct a dismissal of the action, leaving Weil to take such steps as may be appropriate to enable the bankruptcy court to pass the funds in controversy to the creditors.

*Judgment reversed.*