In the Matter of **TAUBER ON BROADWAY, INC.**, a corporation, Bankrupt.

**UNIVERSAL C.I.T. CREDIT CORPORATION,** Appellant,

v.

Gerald P. **GRACE,** Trustee, Appellee.

No. 12588.

United States Court of Appeals
Seventh Circuit.

Oct. 27, 1959.

Edwin A. Rothschild, Norman H. Nachman, Paul J. Miller, Chicago, Ill., for appellant.

Jacob Cohen, Jack Arnold Welfeld, J. H. Schwartz, Ira S. Kolb, Chicago, Ill., (Adolf Loeb, Chicago, Ill., of counsel), for appellee.

Before MAJOR, SCHNACKENBERG and CASTLE, Circuit Judges.

MAJOR, Circuit Judge.

Tauber on Broadway, Inc. was adjudicated an involuntary bankrupt on March 5, 1958. Gerald P. Grace (appellee) was named receiver and subsequently trustee. Jack Welfeld was appointed as his attorney. Universal C.I.T. Credit Corporation (hereinafter referred to as C.I.T.) was the largest creditor. On October 15, 1958, the trustee requested leave to employ Joseph H. Schwartz and Ira S. Kolb of the Chicago Bar as associate counsel with Jack Welfeld, to prosecute a certain claim, hereinafter described, against C.I.T. Both prior and subsequent to adjudication Schwartz and Kolb represented the bankrupt, its corporate officers and others interested in the affairs of the estate either directly or indirectly. C.I.T. objected to their employment on the ground that they represented interests in conflict with those of the estate and trustee and were, therefore, disqualified to represent the trustee. The court overruled the objections interposed by C.I.T. and, on December 19, 1958, entered an order authorizing their employment. From this order C.I.T. appeals to this court.

The contested issue appears to be fairly stated in the trustee's brief. It is as follows: "Are the interests of the Bankrupt, or of its officers, adverse to the Trustee or the Bankrupt Estate with respect to the prosecution of a lawsuit by the Trustee against a creditor, the prosecution of said lawsuit being the extent of Schwartz and Kolb's special retention by the Trustee."

The bankrupt prior to its adjudication was engaged in the sale of automobiles at retail. Max Tauber was president, a director and 75% stockholder of the bankrupt and controlled its operations. Roy Tauber, a brother of Max, was secretary, a director and 25% stockholder. Henry Tauber, another brother, was also a director.

Tauber Leasing Co., Inc. (hereinafter called the Leasing Company) leased automobiles to individuals and commercial and industrial users. Max Tauber was president of this company and Roy Tauber, vice president. Other members of the Tauber family were also officials of the Leasing Company and all of the stock was owned by the family.

C.I.T. was engaged, among other things, in the business of financing the wholesale and retail purchase of automobiles. It financed virtually all of the bankrupt's purchases of new and used automobiles through the medium of trust

·receipts under what is commonly described as Floor Plan Accommodation Financing.

On February 28, 1958, C.I.T. filed a civil action in the United States District Court for the Northern District of Illinois, Eastern Division, against the bankrupt (this was prior to adjudication), the Leasing Company, Max Tauber, Roy Tauber, numerous other members of the Tauber family, as well as certain employees. The complaint charged that defendants conspired to, and did, fraudulently convert to their own use proceeds of sales of automobiles covered by C.I.T.'s trust receipts. It also charged that defendants engaged in various fraudulent schemes to conceal such conversions from C.I.T. These schemes included preparation and submission to C.I.T. of false financial statements, misrepresentations of inventory and diversions of profits of the bankrupt to the Leasing Company. Upon discovery of this fraud and conversion, C.I.T. asserted its rights under the trust receipts and repossessed from the bankrupt automobiles against which it had advanced approximately $456,000, thereby leaving a balance of approximately $330,000, still due and owing C.I.T. This unpaid balance, so it was alleged, represented advances made by C.I.T. on the security of automobiles which were later converted by the bankrupt and the Taubers. Among other things, the complaint prayed for an accounting and for judgment against the bankrupt and Max and Roy Tauber as its officers and as guarantors of the indebtedness to C.I.T.

Schwartz and Kolb, together with other counsel, entered their appearance as attorneys for the bankrupt and for all other defendants in the civil action. Defendants filed answers denying the charges contained in the complaint and also filed a counterclaim against C.I.T., charging it with numerous wrongful acts and seeking damages of some $2,000,000. C.I.T. moved to strike the counterclaim as a sham and offered in support thereof depositions of Max Tauber, Roy Tauber and Henry Tauber, who constituted the officers, directors and all the stockholders of the bankrupt. Henry Tauber testified that he had no personal knowledge of the business affairs of the bankrupt. Max Tauber and Roy Tauber refused to testify, refused to give any information with reference to the counterclaim, refused to state whether its allegations were true or false, whether they had furnished the information contained therein or whether they had authorized its filing, on the ground that their answers might tend to incriminate them.

The court directed Max Tauber and Roy Tauber to answer certain questions which they had refused to answer on deposition. These questions called for an answer as to who furnished the information contained in the counterclaim, who authorized its filing and who, if any other person, might have information concerning its truth or falsity. In connection with this order, the court stated that if answers to the questions were not given the counterclaim would be dismissed. Answers were filed, which the court characterized as evasive. Thereupon, the court again directed Max Tauber and Roy Tauber to give information upon which the counterclaim was drafted and whether its allegations were true or false. Upon their refusal to answer, the court, on October 20, 1958, at a hearing in which the bankrupt, Max Tauber and Roy Tauber were represented by Kolb, dismissed the counterclaim.

On April 11, 1958 (after adjudication), Welfeld, representing the receiver, sought to examine Max Tauber. The bankrupt and the Taubers were represented by Schwartz. Again Max Tauber refused to testify about any of the bankrupt's dealings with C.I.T. He refused to state whether C.I.T. had financed the bankrupt and whether the bankrupt had sold cars covered by trust receipts without accounting to C.I.T. for the proceeds. Specifically, he refused to divulge knowledge of any assets which the bankrupt had not turned over to the receiver, whether any of such assets were held by him or whether they had been turned over to other persons for his benefit. All

the refusals referred to were on the ground that answering the questions propounded or furnishing the information requested might incriminate him.

At a subsequent hearing before the referee, Max Tauber was again represented by Schwartz, who suggested to Tauber that he refuse to answer questions on the ground that they might be incriminatory. Upon being told by the referee that the privilege was personal to the witness, Schwartz advised Tauber, "Mr. Tauber, I advise you that you have the right to refuse to testify or give any answer to any question which you think might tend to incriminate you. That also includes the question of any records or any documents that are in the corporate records or anything else." Thereafter, Tauber refused to answer all pertinent questions.

On June 27, 1958, bankruptcy schedules signed by Marvin Berz (an associate attorney of Schwartz and Kolb) were filed. Subsequently, a motion was made to strike these schedules and to direct that they be prepared and signed by the officers, directors or shareholders of the bankrupt. At the hearing on this motion, Schwartz stated, "Let me say that I would instruct every one of those officers who are parties defendant in the suit before Judge Perry [the civil action] where they are charged with conspiracy to refuse to file the schedules, every one of them." The court directed Max, Roy and Henry Tauber to prepare, sign and file schedules. Thereupon, each of them in an affidavit prepared by Schwartz and Kolb stated that he refused to sign schedules because to do so would tend to incriminate. Each of the affiants was ordered to submit to examination in open court with respect to his claim of privilege. At this examination Max Tauber and Roy Tauber again refused to answer any questions pertaining to the schedules previously signed and sworn to by Berz. They even refused to state whether the documents were true and correct. Berz, who had signed the schedules, was also examined. He refused to disclose what information he had obtained from the officers of the bankrupt, including Max Tauber, for use in his preparation of the schedules. His refusal was based on a claim of attorney-client privilege.

With this background, we come to the order in controversy. As already noted, on petition of the trustee the court authorized the appointment of Schwartz and Kolb as associate counsel with Welfeld for the purpose of prosecuting "a claim of this estate against Universal C.I.T. Credit Corporation as set forth in the counterclaim filed by the bankrupt" in the civil action brought by C.I.T.

█ The controlling rule of law is found in General Order in Bankruptcy No. 44 (11 U.S.C.A. following section 53). It provides in pertinent part as follows:

> "If satisfied that the attorney represents no interest adverse to the receiver, the trustee, or the estate in the matters upon which he is to be engaged, and that his employment would be to the best interests of the estate, the court may authorize his employment and such employment shall be for specific purposes unless the court is satisfied that the case is one justifying a general retainer."

The trustee places much reliance upon Rule 9 of the Bankruptcy Rules of the United States District Court, Northern District of Illinois, which provides that a trustee may retain as special counsel an attorney who at the time of the filing of the petition in bankruptcy was acting for the bankrupt. In our view, this local rule is of no benefit to the trustee. In In re Mandell, 2 Cir., 69 F.2d 830, the court held that General Order No. 44 may be supplemented but not contradicted by local rules. With this holding we agree.

█ No case is cited and our research discloses none where General Order No. 44 has been construed in connection with a factual situation such as is here presented. C.I.T. relies upon Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84

L.Ed. 281; Weil v. Neary, 278 U.S. 160, 49 S.Ct. 144, 73 L.Ed. 243, and the opinion of this court, In re Chicago Rapid Transit Co., 7 Cir., 93 F.2d 832. In each of those cases it was held that attorneys were improperly employed by the trustee because they had interests adverse to the trustee or the bankrupt estate. These cases are of little assistance, however, because of dissimilar factual situations. Even so, the trustee attempts to distinguish them, primarily on the basis that in each of them the involved attorneys were appointed for the trustee under a general retainer, while in the instant case the employment was for the limited purpose of prosecuting a claim against C.I.T. We think this distinction is without merit. As we read these cases, they were decided on the basis that the attorneys employed to represent the trustee had an adverse interest and not that their employment was general rather than special. More than that, General Order No. 44 makes no such distinction. It authorizes the employment of attorneys by the trustee only where they have no adverse interest and this irrespective of whether their employment is general or special.

We need not cite the numerous cases called to our attention by the trustee wherein it has been held that a referee's order approved by the District Court will not be set aside except upon a clear showing of an error of law or a plain mistake of fact. We thus state because we have concluded that the order under attack is erroneous both as a matter of law and of fact.

We shall refrain from any undue criticism of the trustee or the attorneys involved. It may be that their course was determined from information possessed by them but not disclosed by the record before us. We have no hesitancy, however, in expressing the opinion that the record reveals a sordid picture and one which, if tolerated, would cast a serious reflection upon the fairness and integrity of bankruptcy courts. We assume that the officers of the bankrupt corporation had a constitutional right to refuse to answer questions and to file schedules on the ground that to do so might incriminate them and that their counsel were within the bounds of propriety in so advising them. Even so, such refusal resulted in a direct conflict of interest between the officers of the bankrupt and its trustee. The corporate officers were faced with a twofold dilemma: (1) refuse to divulge information relative to the bankrupt and its affairs in order to protect their personal rights, or (2) waive such rights and aid the trustee in ascertaining the assets and liabilities of the bankrupt. They, under advice of involved counsel, elected to pursue the former course.

The argument by the trustee that there was no conflict of interest because the involved attorneys were employed only for the limited purpose of prosecuting a claim against C.I.T. is, in our judgment, devoid of all reason and logic. Particularly is this so when we examine the allegations of the counterclaim which the trustee proposes to adopt as the basis for recovery in a plenary suit. A brief résumé of the lengthy allegations of the counterclaim will demonstrate this point. The counterclaim alleged that the corporation, through the industry of its officers, agents and employees, had by February 1958 established a prosperous, growing business in the sale of new and used automobiles, the sale of replacement parts and the service and repair of vehicles; that its physical plant, consisting of modern facilities for the display, sale and repair of automobiles, was acquired through the expenditure of much money; that it expended large sums in acquiring and training the necessary personnel to operate its business efficiently, and that from 1953 to 1958, it enjoyed average annual gross sales in excess of $5,000,000. It further alleged that it held a valuable franchise from Ford Motor Company, authorizing the sale of new automobiles manufactured by that company and it also possessed valuable good will in the industry and in the community which it served. It alleged all sorts of nefarious conduct and activities on the part of

C.I.T., as a result of which the claimant was "forced to discontinue business, lost its valuable franchise to sell new Ford automobiles, and suffered a complete loss of its valuable good will, to the damage of the counter-claimant in the sum of $1,250,000."

We have heretofore briefly referred to the allegations made by C.I.T. against the bankrupt and its officers. We think we may assume that C.I.T. will make the same or similar allegations in answer to the proposed action by the trustee. Thus, we have a situation where both the trustee and C.I.T. urge by their respective pleadings that the bankrupt was hopelessly insolvent at the time of adjudication and for a long period prior thereto. The conclusion is inescapable that the controlling issue in an action by the trustee against C.I.T. will be as to which of the parties was responsible for such insolvency. A trial of this issue will encompass all the transactions which have taken place between the parties for a period of years, with the production of all agreements between the parties, as well as books and records kept or maintained by the bankrupt. Max Tauber as president of the corporation owned 75% of its stock, and Roy Tauber as secretary of the corporation owned 25%. They not only owned the corporation but they were its active managers and operators. How the trustee could hope to prevail in the proposed action against C.I.T. without their testimony is not discernible. However, when they are called upon by either of the parties to give oral testimony or to produce and identify essential corporate records, if the future can be judged by the past, they will refuse to do so for fear of incrimination, and their attorneys who have been employed to represent the trustee can be depended upon to advise them that they are not required to testify.

It must be remembered that the District Judge warned the Taubers and their counsel that their refusal to testify would result in a dismissal of the counterclaim and, upon their refusal, it was dismissed. The Taubers, both as former officials of the bankrupt and in their individual capacity, are primarily concerned in refusing to divulge essential information lest it lead to their prosecution. The trustee is interested in utilizing that information in proving a claim against C.I.T. The involved attorneys represent both interests. We are unable to visualize a conflict more pronounced and direct. In our judgment, the contrary conclusion by the referee, approved by the District Court, was, as previously stated, an error of law and a mistake of fact.

The order appealed from is reversed and the cause remanded for further proceedings not inconsistent with the views herein expressed.