**Homer TOLLIVER, Acutus Industries, of Michigan, a Michigan Corporation, Appellants (Defendants Below),**

v.

**Marte MATHAS, Appellee (Plaintiff Below).**

No. 4–885A223.

Court of Appeals of Indiana, Fourth District.

Aug. 24, 1987.

David C. Jensen, Paul A. Rake, Eichhorn, Eichhorn & Link, Hammond, John W. Barce, Barce, Vann, Ryan & Howard, Fowler, for appellants.

Lowell E. Enslen, Gary K. Matthews, Enslen, Enslen & Matthews, Hammond, Thomas R. McConnell, Nolin & McConnell, Fowler, for appellee.

MILLER, Presiding Judge.

Marte Mathas sued Homer Tolliver, president and owner of Acutus Industries, and Acutus Industries of Michigan (hereinafter collectively, Acutus) for breach of two oral contracts. In one of these contracts, Acutus agreed to reimburse Mathas for funds

he expended to gain control of certain shares of stock in T & M Manufacturing; in the other contract, Acutus agreed to reimburse Mathas for funds he expended to keep T & M, a financially troubled company, operating. These contracts were made while T & M was under the jurisdiction of the bankruptcy court for the Northern District of Indiana. After trial by jury, the Benton Circuit Court awarded Mathas a judgment of $85,000. Acutus appealed, alleging, among other things, that the contracts between Mathas and Acutus violated the bankruptcy code and are void as against public policy. We agree, and reverse the judgment of the Benton Circuit Court.

## FACTS

In 1973, Marte Mathas and three other individuals formed a corporation known as T & M Fabricating, Inc., which provided welding services to the steel industry in the Calumet Region. At first T & M grew rapidly, reaching $1,300,000 in sales in 1978. During this period of rapid growth Mathas was the primary manager of daily operations, as well as owner of one-third of the outstanding shares of the corporation.

T & M began experiencing financial difficulties in 1979. These difficulties continued through 1980, primarily because of the decay of the steel industry in the northwest part of the state. On November 7, 1980, T & M filed a bankruptcy petition in the Bankruptcy Court for the Northern District of Indiana.

Mathas and the other shareholders, David Willis, Ed Auten, and George Bonnich, also began to look for parties interested in buying T & M. Acutus Industries of Pontiac, Michigan, expressed an interest and, in November of 1980, representatives of Acutus toured T & M. During this trip the parties began preliminary discussions of a possible sale. These discussions ended abruptly when Willis outlined his expectations for T & M and quoted a purchase price which the Acutus representatives considered wildly unrealistic. The Acutus representatives returned to Detroit.

Acutus remained interested in acquiring T & M, but felt it would be impossible to do so while Willis retained an ownership interest in T & M. An agent of Acutus informed Mathas that Acutus was still interested in the purchase if Mathas could somehow remove Willis from the transaction. Mathas ascertained that Willis would be willing to sell his interest in T & M for $85,000. After Mathas informed Tolliver that Willis could be bought out, Tolliver asked Mathas to see if he could get Willis to sell for less than $85,000. When Willis said he would accept $65,000, Tolliver instructed Mathas to buy the stock and told Mathas that Acutus would reimburse any funds Mathas expended to purchase the shares. In January of 1981, Tolliver and Mathas finalized the agreement. Mathas agreed to buy out Willis, and Tolliver agreed to reimburse Mathas by assuming Mathas's obligations under two notes.

At this time the financial situation of T & M deteriorated further. There were no funds remaining to pay the workers, and Mathas informed Tolliver that T & M would have to close down. Tolliver asked Mathas to use his own funds to keep T & M from closing down. Mathas was reluctant to do so because he had already put $7,600 of his own money toward keeping T & M a going concern. When Tolliver assured Mathas that he would repay Mathas for any funds put into the operation, including the $7,600 Mathas already advanced, Mathas agreed to continue to keep the business running. He put an additional $18,000 into the daily operation of the firm.

After Mathas acquired Willis's shares of T & M, T & M and Acutus were able to agree on a plan for the purchase of the corporate assets. They submitted this plan to the bankruptcy court on January 22, 1981. The plan was modified, resubmitted on March 10, and accepted by the court on July 27. It is undisputed that the court was not informed of the Mathas-Acutus agreements.

After the sale, Acutus began paying off Mathas's debts. Acutus also hired Mathas as a sales representative. In November,

however, Acutus fired Mathas and stopped payment on his debts.

## DECISION

Acutus brings several issues for our review. We need not address all these issues, because a single issue is dispositive of this case. Acutus alleges the contract with Mathas is illegal and void as against public policy. We find we must agree.

■ Generally, a contract made in violation of a statute is void. *Maddox v. Yocum* (1941), 109 Ind.App. 416, 31 N.E.2d 652; 6 I.L.E. § 3. The determination of whether a contract violates the statute is a question of law for the court, not a question of fact for the jury. *Ross Clinic v. Tabion* (1981), Ind.App., 419 N.E.2d 219.

Acutus argues the contracts violated several sections of the bankruptcy code. We do find a violation of one of those sections and must therefore reverse.

The code provided,[1] in part:

"The court shall confirm a plan only if all of the following requirements are met: *Any payment made or promised by* the proponent, by the debtor, *or by a person* issuing securities *or acquiring property under the plan, for services or for costs and expenses* in, or in connection with the case, *or in connection with the plan and incident to the case,* has been disclosed to the court...." 11 U.S.C. 1129(a)(4)(A). (emphasis added).

It is obvious the code required disclosure in order to protect creditors from collateral transactions which might impair their recovery from the debtor in possession. *Ely v. Donoho* (S.D.N.Y.1942), 45 F.Supp. 27. The bankruptcy court is entrusted with the task of examining the available information to ensure that no assets of the debtor in possession are being diverted from the creditors to other parties, especially equity holders. *Id.* It was therefore imperative that all relevant information be reported in the disclosure documents. *In re Wilson Realty Corp.* (E.D.Mich.1938) 30 F.Supp. 486.

Our research has not revealed any case which has considered the question of whether a failure to notify the bankruptcy court of a contract when required by § 1129(a)(4)(A) renders the contract unenforceable as illegal or against public policy. We have, however, found precedent in a similar type of case which leads us to conclude a violation of this section should render the contract unenforceable.

In *Weil v. Neary* (1929), 278 U.S. 160, 49 S.Ct. 144, 73 L.Ed. 243, the majority of the creditors of Josiah Thompson retained an attorney named Samuel Untermeyer to collect the debts Thompson owed them. Untermeyer retained a separate law firm, Weil & Thorpe, to conduct, under his supervision, bankruptcy proceedings against Thompson. Weil & Thorpe were to receive $5,000 for their services. Weil & Thorpe instituted proceedings against Thompson based on the petition of three creditors. After the bankruptcy court adjudicated Thompson bankrupt and appointed trustees of the bankruptcy estate, the trustees appointed Weil & Thorpe as trustees' counsel. However, the bankruptcy turned out to be more difficult than Untermeyer and Weil & Thorpe had anticipated. Untermeyer and Weil & Thorpe agreed that Untermeyer's firm, Gugenheim, Untermeyer & Marshall, should collaborate with Weil & Thorpe in providing services to the trustees. Weil & Thorpe would retain a percentage of the fees for representing the trustees, and Untermeyer would retain the remainder of the fee. Untermeyer would supervise the collaboration, and he would set the percentage of the fee to which Weil & Thorpe was entitled. When the bankruptcy proceedings were closed, Untermeyer demanded

---

1. As the dissent notes, this section was subsequently amended. It now reads:

"(a) The court shall confirm a plan only if all of the following requirements are met:

\*   \*   \*   \*   \*   \*

(4) Any payment made or to be made by the proponent under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable."

We do not believe this subsequent amendment should change the result here.

his percentage of the fees, but Weil & Thorpe refused to pay him. Untermeyer assigned his cause of action to Edward M. Neary, who brought suit against Weil.

Weil argued that the contract between Untermeyer and Weil & Thorpe was unenforceable because it was illegal and it was against public policy. At the time of the Thompson bankruptcy the District Court for the Western District of Pennsylvania—the court in which the bankruptcy was filed—operated under a local bankruptcy rule which prohibited the trustees of the bankrupt's estate from retaining an attorney who also represented the creditors unless the trustees sought prior authorization by the District Court. The Supreme Court found the contract void as against public policy even though the lower court had found the agreement had benefitted the creditors. Chief Justice Taft noted that local rule 5 was adopted to safeguard the interests of all parties to the bankruptcy, and failure to adhere to the rule exposed the parties to various dangers. He stated:

> "The controversy is not an ordinary one between two parties. The issue concerns the action of both [the plaintiff and defendant] towards the bankruptcy court. A question of public policy is presented—not a mere adjudication of rights between the two parties." *Id.* at 171, 49 S.Ct. at 148-149.

Justice Taft went further, and suggested that, even without rule 5, the failure to inform the court of a matter may have influenced the fair administration of justice would have rendered the contract void and unenforceable, stating:

> "We have specially referred to rule 5, under which the illegality of the contract

is clear, but we are not to be understood as holding that, without the rule, the transaction under consideration would not be contrary to public policy and void."

*Id.* at 172, 49 S.Ct. at 149.

■ Returning to the case before us, the undisclosed contracts between Acutus and Mathas clearly violate § 1129(a)(4)(A). It cannot be disputed that the promised transfers of $65,000 and $18,000 from Acutus to Mathas qualify as payments promised by a person acquiring property under the plan. It is equally clear that the promised payments were made "in connection with the plan and incident to the case"; indeed, Mathas asserts that there would have been no plan in the absence of the agreements, since Acutus would not have purchased the assets if Willis retained his shares of the T & M stock or if T & M had ceased operations.

Mathas argues these contracts did not harm the creditors and, in fact, benefitted them since the contracts facilitated the sale of the T & M assets. Thus Mathas claims no harm—no foul. However, we must observe that the lack of harm to the creditors is not the determinative factor here.[2] By violating this section Mathas deprived the bankruptcy court of the opportunity to determine whether the contract violated the creditors' rights. *Weil, supra.* By doing so Mathas undermined the authority of that court to oversee the bankruptcy in the manner mandated by Congress. The harm that results from Mathas's violation is not the impairment of the creditors' rights, but rather the threat to the system that oversees and protects those rights.[3]

---

**2.** In Indiana, courts may refuse to enforce an illegal agreement even if the agreement itself does not harm either party or the public. *Brown v. First National Bank of Columbus* (1894), 137 Ind. 655, 37 N.E. 158. The *Brown* court stated:

> "The question of the validity of the contract does not depend upon the circumstance whether it can be shown the public has in fact suffered any detriment, but whether the contract is, in its nature, such as might have been injurious to the public. It matters not that any particular contract is free from any taint, or actual fraud, oppression, or corruption.

The law looks to the general tendency of such contracts." *Id.,* 137 Ind. at 669, 37 N.E. at 163.

**3.** In *Weil,* the Court explicitly stated that it was not actual harm to the creditors, but the great potential for harm, which rendered such contracts unenforceable as against public policy:

> "The chief argument that is pressed upon us to declare the contract valid and to sustain the judgment based upon it is the success with which the plaintiff is found to have worked out a useful settlement of the estate for the benefit of the creditors, and the absence of

The dissent relies exclusively upon a 1924 decision of the Indiana Appellate Court, *New Amsterdam Casualty Co. v. Madison County Trust Co.* (1924), 81 Ind. App. 157, 142 N.E. 727. For several reasons, we believe this reliance misplaced. We must first note *New Amsterdam* was decided prior to *Weil*, and we question whether the *New Amsterdam* court would have reached the same result in light of the Supreme Court's strong statement in *Weil*. Furthermore, *New Amsterdam* dealt with a state receivership, while *Weil* dealt with a violation of federal bankruptcy regulations. Since the contracts here violated the federal bankruptcy code, we feel compelled to give great credence to the *Weil* decision.

In any event, we do not believe the holding in *New Amsterdam* is relevant to this case. At first blush, the factual situations of the two cases appear to be similar, but a closer examination reveals New Amsterdam is not apposite because the court did not address the same public policy issue which we address today. Neither *New Amsterdam* nor the case upon which its public policy holding rests, *Polk v. Johnson* (1903), 160 Ind. 292, 66 N.E. 752, addressed the question of whether it is against public policy to execute contracts affecting an insolvent company without informing the court charged with overseeing the receivership.[4]

The *New Amsterdam* case arose out of the financial difficulties of the Wagner Axle Company. Wagner Axle had entered into a contract to produce hubs and wheel fastenings for artillery carriages for the United States government. The government advanced Wagner Axle $30,000 on the contract, and the New Amsterdam Casualty Company agreed to act as surety on the $30,000 for Wagner Axle. Wagner Axle soon began experiencing financial problems. Among its obligations was a contract under which it was obligated to make certain installment payments to one of its creditors. If Wagner Axle defaulted on these payments, the creditor, Sansberry, would have been entitled to take possession of Wagner Axle manufacturing facilities.

New Amsterdam saw that Wagner Axle was in danger of defaulting on its contract with the government. In order to prevent this default, New Amsterdam persuaded another of Wagner Axle's creditors to petition for the appointment of a receiver for Wagner Axle. The creditor did so, and Wagner Axle appeared and consented to the appointment of the receiver.

New Amsterdam approached the Madison County Trust Company and asked it to act as the receiver. In order to induce Madison County to act as receiver, New Amsterdam agreed to pay any claims for services allowed by the supervising court, and agreed to repay Madison County any sums expended to keep Wagner Axle operating. It is unclear whether New Amsterdam agreed either to pay the claims in the first instance, or only if there were no assets in Wagner Axle available to pay the

---

any finding or showing that there was actual fraud. *But this is not a sufficient answer to the charge of illegality.* The contract is contrary to public policy—plainly so. *What is struck at in the refusal to enforce contracts of this kind is not only actual evil results but their tendency to evil in other cases. Even if the ultimate results in the management of the Thompson estate were good, that could be no excuse for a contract plainly illegal,* because tending to produce disloyalty by agents and trustees. *Enforcement of such contracts when actual evil does not follow, would destroy the safeguards of the law and lessen the prevention of abuses." Weil, supra* 278 U.S. at 173–174, 49 S.Ct. at 149 (citations omitted) (emphasis added).

**4.** The court in *Polk* specifically noted, "It is not averred in the exception whether or not the private agreement was communicated to the court before his appointment, or that the court had or had not knowledge of it at the time the appointment was made." 160 Ind. at 298, 66 N.E. at 754. The court did, however, note that the trial court had a duty to scrutinize the contract, stating:

"The court will closely scrutinize the bargain, when known to him; and if it seems clear that the bargainer is qualified and the contract free from overreaching, and will be beneficial to the trust, the court may properly respect the contract, and make the appointment in pursuance of its terms." 160 Ind. at 296, 66 N.E. at 753–754. (citations omitted) Obviously, the court cannot engage in this kind of scrutiny if it is not informed of the agreement.

claims. It is also unclear whether the supervising court was informed of this contract before the appointment of the receiver or at any time thereafter. The court did, however, appoint Madison County as receiver. Madison County served as receiver until Wagner Axle was forced into bankruptcy. At that time Madison County tendered a "long detailed report" of its activities to the court supervising the state receivership. *Id.*, 81 Ind.App. at 165, 142 N.E. at 729.

When Madison County tried to enforce the contract, New Amsterdam asserted the contract was unenforceable as being against public policy because it was a kind likely to compromise the receiver's neutrality. The appellate court rejected this contention, stating that the acts of reimbursing the receiver for expenses and guaranteeing payment of administrative fees were not, in and of themselves, illegal or against public policy. The court never addressed the question of whether *secret* contracts affecting a company in receivership were against public policy. Further, we are not convinced the appellate court's conclusion that the contract was beneficial to the creditors was correct. New Amsterdam sought appointment of a receiver for Wagner Axle in order to ensure the completion of the government contract upon which New Amsterdam was surety. It was in New Amsterdam's interest to keep Wagner Axle a going concern until completion of the contract regardless of whether continued operations preserved or impaired the rights of the other creditors. In the Wagner Axle receivership, as in all receiverships, a threshold question is whether to liquidate or continue operations. The receiver acts as an advisor assisting the court in making this determination. A receiver's failure to advise the court that it had made a prior commitment to continue operations and not to liquidate might very well affect the court's decision to appoint the receiver. As stated earlier, the appellate court's decision does not reveal whether the trial court was informed, either before the receiver's appointment or before it authorized Wagner Axle to continue its operations, of the receivers prior commitment to continue oper-

ations. Thus, the trial court might have been unaware that Madison County had reason to favor New Amsterdam over the other creditors. Also, the appellate court *assumed* continued operations would render Wagner Axle more salable and thus benefit the creditors. We question this assumption, since continued operations resulted in continued losses and eventual bankruptcy. It seems these operations so depleted Wagner Axle's assets as to render the estate incapable of fully paying the costs Madison County incurred in acting as receiver.

■ In the case before us, we do not say that the actual provisions of the contracts between Acutus and Mathas were illegal or against public policy. We are concerned that the failure to inform the bankruptcy court of these contracts, in the face of a statutory command that the court be informed, could lead to abuse of the bankruptcy system and threaten the rights of the creditors whom the system was designed to protect. The dissent would have us approve these contracts because they worked no actual harm, but we are not the proper court to judge whether these contracts were harmful. That task belonged to the bankruptcy court, and we are not free to substitute our view of what is harmful for that of the bankruptcy court. As Chief Justice Taft aptly observed in *Weil*:

> "We see no reason for *assuming* the District Court would not have made serious objection to the contract had it known its terms. *Such an assumption would be unfair to the court. Certainly it was not for another court to determine whether the situation justified a waiver of the rule.*" *Weil, supra* 278 U.S. at 171, 49 S.Ct. at 148. (emphasis added).

The dissent would have us make a determination which should have been made by the bankruptcy court, but which Mathas's failure to report prevented that court from making. This we cannot do.

We share the dissent's displeasure with the conduct of Acutus in this case; indeed, we emphasize that this opinion should in no

way be read to condone what Acutus has done. We cannot, however, ignore the fact the contract did violate the code and that, even though this contract might not have worked to the detriment of the creditors, other secret agreements whose disclosure are required are all too apt to do so.

We must therefore conclude the contracts between Acutus and Mathas are void as illegal and violative of public policy. Therefore, we reverse the judgment of the Benton Circuit Court and remand with instructions to enter judgment in favor of Acutus and Tolliver.

Reversed.

RATLIFF, C.J., dissents with opinion.

YOUNG, J., concurs.

RATLIFF, Chief Judge, dissenting.

I respectfully dissent.

The majority places undue emphasis upon *Weil v. Neary* (1929), 278 U.S. 160, 49 S.Ct. 144, 73 L.Ed. 243. Although I agree that apparently no court has yet addressed the question of whether a failure to disclose a contract pursuant to 11 U.S.C. § 1129(a)(4)[1] renders the contract unenforceable in a separate civil suit, I believe a more appropriate analysis for the facts in the present case is found in a 1924 decision. *New Amsterdam Casualty Co. v. Madison County Trust Co.* (1924), 81 Ind.App. 157, 142 N.E. 727, involved the receivership of a business under state statutes. Wagner Axle Company entered into a contract with the United States government for military products. The government advanced $30,000 to Wagner Axle, with New Amsterdam Casualty as surety ·to guarantee the government against loss. When Wagner Axle became insolvent, its creditors threatened to commence receivership proceedings. The surety contracted with the Madi-

son County Trust Company to be the court-appointed receiver. The oral contract provided that Madison County Trust would advance money to keep Wagner Axle in operation and would provide management services, all in an attempt to avoid liquidation. In return, New Amsterdam, the surety, promised to pay for such advances and services. Relying upon these promises, Madison County Trust accepted the receivership and conducted Wagner Axle's business. Ultimately, however, Wagner County Trust went into bankruptcy.

Madison County Trust filed suit in state court against New Amsterdam Casualty for breach of the agreements. One of New Amsterdam's defenses was that the agreements were void as against public policy. In addressing this claim, the court held as follows:

"The unquestioned rule is stated that a receiver is bound to maintain an attitude of strict neutrality between all the parties in interest, and any agreement which might tempt him to sacrifice or jeopardize the interests of one for the benefit of another in interest is contrary to public policy. But it does not follow that one interested in the successful management of an industrial plant, that it may, if possible, protect itself against a loss of $30,000, may not use its influence in inducing some one competent to accept an appointment as receiver to operate the plant. Nor does it follow that where, as here, there was no money available with which to operate, such an interested party may not promise such receiver to furnish money for the purpose of manufacturing material which had been purchased for use in carrying out the contract, the default of which it seeks to avoid. Nor does it follow that such money may not legitimately be furnished to

---

1. In 1984, Congress amended 11 U.S.C. § 1129(a)(4) to read as follows:
   "(a) The court shall confirm a plan only if all of the following requirements are met:
   . . . .
   "(4) Any payment made or to be made by the proponent under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and inci-

dent to the case, has been approved by, or is subject to the approval of, the court as reasonable."
Thus, due to the deletion of portions of the statute, if this case had arisen under § 1129(a)(4) as amended, there would have been no violation since the statute presently does not require the disclosure of agreements such as those between Acutus and Mathas.

keep the plant a going concern thereby making it more salable. Such acts, within themselves, were not against public policy. They of necessity inured to the benefit of other creditors. There is not the slightest suggestion that the receiver was in any way partial to [New Amsterdam Casualty], or that it did not in every particular obey the orders of the court.... To permit appellant under the circumstances of this case to avoid its obligations on the ground that it was against public policy would be unconscionable."

*Id.* at 164–65, 142 N.E. at 729.

I believe that the *New Amsterdam* decision is a better approach than *Weil v. Neary.* In the present case, as in *New Amsterdam,* Homer Tolliver and Acutus Industries were "vitally interested in the welfare of the [company]." *New Amsterdam,* at 162, 142 N.E. at 728. Homer Tolliver and Acutus Industries induced Marte Mathas to make substantial expenditures which inured to the benefit of Tolliver and Acutus. Without the amounts expended by Mathas in buying out David Willis, Acutus could not have acquired the assets of T & M Manufacturing. Furthermore, T & M would have had to close down but for Mathas's cash advances for which Acutus promised reimbursement. Additionally, the majority opinion concedes that these contracts benefitted T & M's creditors. I conclude, as did the court in *New Amsterdam,* that "[t]o permit appellant under the circumstances of this case to avoid its obligations on the ground that it was against public policy would be unconscionable." *Id.* at 165, 142 N.E. at 729.

If a creditor, as opposed to Acutus, opposed the validity of the agreements, I would be compelled to reach an opposite result. The bankruptcy code is designed specifically to protect the rights of creditors. Here, however, Tolliver and Acutus are attempting to avoid their contractual obligations through the guise of the bankruptcy code. I would not tolerate this result.